The Deposition of

# DR. RICHARD V. BARATTA, PH.D, P.E.

In the Matter of

## JEFFREY KILLIAN AND BRANDY BANES

versus

## DEAN ANDERSON, ET AL

Taken On

## JANUARY 12, 2021



UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

ALEXANDRIA DIVISION


JEFFREY KILLIAN AND          * NO. 1:19-CV-01220
BRANDY BANES
                             * JUDGE DRELL
VERSUS
                             * MAGISTRATE JUDGE PEREZ-
DEAN ANDERSON, CENTRA          MONTES
TECHNOLOGY, INC. AND         *
HANOVER INSURANCE COMPANY
* * * * * * * * * * * * * * * * * * * * * * * * *


      The deposition of DR. RICHARD V. BARATTA,

PH.D., P.E., taken in connection with the

captioned cause, pursuant to the following

stipulations before Cynthia M. Hare, Certified

Court Reporter, at 3500 North Causeway

Boulevard, Suite 350, Metairie, Louisiana

70002, on the 12th day of January 2021,

beginning at 12:56 p.m.

```
 1   APPEARANCES:

 2


 3   FOR THE PLAINTIFFS, JEFFREY KILLIAN
     AND BRANDY BANES:
 4
         BRIAN M. CAUBARREAUX, ESQUIRE
 5       BRIAN CAUBARREAUX & ASSOCIATES
         2204 MacArthur Drive
 6       Alexandria, Louisiana 71301

 7
     FOR THE DEFENDANTS, DEAN ANDERSON, CENTRA
 8   TECHNOLOGY, INC. AND HANOVER INSURANCE COMPANY:

 9       PAUL LAVELLE, ESQUIRE
         COTTEN SCHMIDT, LLP
10       650 Poydras Street, Suite 1950
         New Orleans, Louisiana 70130
11
      ALSO PRESENT:
12
         SUE LAVELLE
13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                  S T I P U L A T I O N

2          It is hereby stipulated by and among counsel

3     for plaintiff and counsel for defense that the

4     deposition of

5              DR. RICHARD V. BARATTA, PH.D., P.E.

6     be taken before Cynthia M. Hare, Certified Court

7     Reporter, by counsel for the plaintiffs, for all

8     purposes, pursuant the appropriate statutes of the

9     Federal Rules of Civil Procedure.

10         The parties hereto waive all formalities in

11    connection with the taking of said deposition,

12    except the reading and signing thereof, the swearing

13    of the witness and the reduction of the questions

14    and answers to typewriting.

15         Counsel for all parties reserve all objections,

16    except as to the form of the question and

17    responsiveness of the answer, at the time of taking

18    said deposition, but they also reserve the right to

19    make objections at the time said deposition or any

20    part thereof may be offered in evidence, with the same

21    rights as if the testimony had been taken and given in

22    Open Court.

23                     *    *    *

24

25

```
1                        INDEX

2

3   EXAMINATION BY MR. CAUBARREAUX . . . . . . . . . 5

4

5   OBJECTIONS:

6   BY MR. LAVELLE . . . . . . . . .21,22,41,49,54,66,70

7

8   EXHIBITS:

9   EXHIBIT 1 - Information Sheet. . . . . . . . . . 7

10  EXHIBIT 2 - Report . . . . . . . . . . . . . . 8

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1         DR. RICHARD V. BARATTA, PH.D., P.E.,

2 after having been duly sworn, was examined and did

3 testify as follows:

4 EXAMINATION BY MR. CAUBARREAUX:

5 Q    Sir, I'm Brian Caubarreaux. I represent the

6      plaintiffs, Ms. Banes and Mr. Killian.  If you

7      could, please state your full name and

8      professional address for the record.

9 A    My full name is Richard Victor Baratta.  My

10     professional address just changed, so up until

11     a few months ago it was 8 Greenway Plaza, Suite

12     500.  And right now, I don't remember what it

13     is because I haven't moved into the new office.

14 Q    And what town are you --

15 A    My office is in Houston, Texas.

16 Q    Houston, okay.  Now, if you could, tell me

17     about your educational background.

18 A    Sure.  I have a bachelor's degree from Tulane

19     University in biomedical engineering and

20     mathematics. I took that in 1984.  And then I

21     got a master's degree in biomedical engineer,

22     also from Tulane.  I got that in 1986.  And

23     finally, my Ph.D. was in biomedical

24     engineering, also from Tulane in 1989.

25 Q    What is the profession, biomedical engineering

1        encompass?

2   A    So the start to finishing of biomedical

3        engineering is the application of principles of

4        engineering to questions that arise in medicine

5        and biology.

6   Q    In this particular case you've been asked to

7        give an opinions in what areas?

8   A    Accident reconstruction and biomechanics.

9   Q    I saw in your reports with regard to accident

10       reconstruction you were not asked to give an

11       opinion with regard to who caused the accident.

12  A    That is correct.

13  Q    Okay.  The correspondence that requested what

14       parameters, or topics you cover and don't

15       cover, do you have that, and is that

16       encompassed in this zip drive you just gave me

17       before this deposition?

18  A    I don't know what there is an express place

19       where it specifically says that that -- I don't

20       know that such a thing exists.

21  Q    Are you normally, when you're called upon to

22       give an -- do an accident reconstruction, asked

23       not to comment on who caused the accident?

24  A    In the course of my practice, more often than

25       not, that is the case.

```
1        MR. LAVELLE:
2            If you're looking for the information
3        that was given today?
4        MR. CAUBARREAUX:
5            Yes, sir.
6        MR. LAVELLE:
7            I believe that was information obtained
8        from me.
9        MR. CAUBARREAUX:
10            Yes, sir.
11        THE WITNESS:
12            So towards the bottom there, there's a
13        question of what they would like from
14        Rimkus.
15        MR. CAUBARREAUX:
16            I'm going to attach a copy of this as
17        Exhibit 1.
18        MR. LAVELLE:
19            You want to put a sticker on it?
20        MR. CAUBARREAUX:
21            I am, if that's okay.  Is this a copy,
22        or this is your original?
23        MR. LAVELLE:
24            Well, it's not an original, I just
25        printed it off of my material that I had
```

```
 1              today.  So I've got it electronically, but
 2              that's the only copy I have with me.  But
 3              we can use it.
 4              MR. CAUBARREAUX:
 5                  Okay, I'll put this as Exhibit 1.
 6  MR. CAUBARREAUX:
 7  Q   As part of this process of retention of you as
 8      an expert, you were asked to generate a report,
 9      correct?
10  A   Yes, sir.
11  Q   I'd like you to look at this report.
12              MR. CAUBARREAUX:
13                  Paul.
14              MR. LAVELLE:
15                  All right.
16  MR. CAUBARREAUX:
17  Q   I'd like you to look at it and see if this
18      encompasses the entirety of your report and all
19      the information generated in this case.
20  A   This is the report, and I see the usual
21      attachments towards the end of it.  It appears
22      that it is, sir.
23  Q   Okay.  We're going to be talking about it a lot
24      so I'm going to mark that as Exhibit 2.
25              MR. LAVELLE:
```

```
 1              This is the report that was produced on
 2         October 30, 2020?
 3         MR. CAUBARREAUX:
 4              Correct.  And it has your cover letter
 5         sending it to me on that date.
 6         MR. LAVELLE:
 7              Okay.
 8         MR. CAUBARREAUX:
 9              This will be 2 in globo (Exhibit 2).
10    MR. CAUBARREAUX:
11    Q    And you have a copy of that report in front of
12         you, correct?
13    A    Up to the figures.
14    Q    Okay.  So you were called upon to do an
15         accident reconstruction, not to determine fault
16         but to attempt to determine forces of the
17         vehicles or occupants in the accident; am I
18         fair in understanding it that way?
19    A    Fairly close.  Not strictly forces, but
20         dynamics.
21    Q    In doing these accident reconstructions, what
22         type of information do you want to gather?
23    A    Well, usually what we will -- we will gather
24         damage information regarding the damage to the
25         vehicle.  We will gather, also, the vehicle's -
```

```
 1            - we will also gather information regarding the
 2            dimensions and the -- and other inertial
 3            properties of the vehicles.
 4    Q       Inertial properties of a vehicle, what is that?
 5    A       It starts with the weight.  And it also uses
 6            other analogs to weight, but that involve
 7            rotation.
 8    Q       Okay, what are those analogs?
 9    A       So the -- they're called moments of inertia.
10            And there's three of them, one across -- one
11            around each axis.
12    Q       Okay.  And how do you -- what are you looking
13            for when you look at a car, or a particular
14            vehicle to determine these three things?
15    A       That is generally given in -- in published
16            information.
17    Q       And what is it telling you?
18    A       It's telling you what is the current weight of
19            the vehicle.  It is also telling you what are
20            the three moments of inertia of the vehicles.
21            And to make it -- to make it easy to
22            understand, moment of inertia is how easy it is
23            for a vehicle to rotate, to -- as opposed to
24            push something, which would be the weight, as
25            how much it tends to rotate.  Either to yaw, to
```

```
 1         roll, or to pitch.
 2    Q    So in looking at that, how do you determine,
 3         are you looking at the suspension, the tires,
 4         are you looking at the roadway, the friction
 5         coefficient of the roadway, is it asphalt, is
 6         it dirt, is it mud, is it ice?  Are you looking
 7         at all of those different factors, or no?
 8    A    Those different -- those factors, unless one
 9         has reason to think otherwise, are basically
10         built in.  We normally work on friction
11         coefficients in the range of .7.  But these are
12         the ways -- these are -- the co-moments of --
13         and they're simply is how hard it is to take
14         something and spin it, excluding -- excluding
15         friction and other things like that.
16    Q    Those things are a factor, are they not?
17    A    They are, but this is in the same way that the
18         weight is separate and independent of -- of
19         friction, so are the moments of inertia.
20    Q    Okay.  So it's not important, then, to look at
21         whether or not you're dealing with asphalt
22         surface versus concrete surface, whether or not
23         you're dealing with certain types of tires
24         versus other types of tires, when you're
25         determining whether or not there's a spin rate
```

```
 1        on a vehicle?
 2   A    The differences between concrete and asphalt
 3        are small enough that it makes no meaningful
 4        difference.  And the difference in tires also
 5        make no meaningful difference.
 6   Q    Whether -- how about a wet road versus a dry
 7        road?
 8   A    Yes, then you have a greater -- if the road is
 9        wet, then the vehicle has a greater potential
10        to spin.  Not because of its inertial
11        properties, but because it has lower -- it has
12        lower friction with the road.
13   Q    Did you take that into account in this
14        particular case?
15   A    It was assumed that the roadway was dry.
16   Q    Okay.  You assume that?
17   A    Presumed that.
18   Q    Presumed that.  Okay.  Did you inspect the
19        scene of the accident?
20   A    By "scene," you  mean site, no, sir.  Not
21        physically.
22   Q    So you didn't go to the scene where the
23        accident occurred to look at the roadway, look
24        at the way the place laid out?
25   A    No, other than through Google maps.
```

1   Q   Did you physically inspect the vehicles

2       involved in the accident?

3   A   We performed physical inspections of the

4       trailer, and I think that was it.   I think we

5       took photographs of the other vehicles that

6       were on the trailer, if I recall correctly.

7   Q   Did you inspect the Ford that was being driven

8       by Mr. Killian?

9   A   Not physically.

10  Q   Well, it's either you did or you didn't.   Did

11      you inspect it or not?

12  A   I don't believe we did.

13  Q   Okay.   How about the GMC, did you inspect that?

14  A   No, sir.

15  Q   Do you know the extent of the damage done to

16      the GMC?

17  A   I know the damage shown by the photographs.

18  Q   But do you know the full extent of the damage

19      done to the GMC that was driven by your -- by

20      the person -- the attorney's -- by the client

21      whose attorney hired you?

22  A   Not outside of what was shown in the

23      photographs.

24  Q   So how many photographs did you look at?

25  A   We had one photograph of the Chevrolet.

```
1    Q    Did you have any damage estimates to show you
2         if there was any undercarriage damage, or
3         structural damage, or the vehicle was totaled
4         or anything like that?
5    A    There was no repairs to make for that
6         Chevrolet.
7    Q    Do you know if the air bags deployed?
8    A    There was no indication in the accident report
9         that they did.
10   Q    Do you know if the air bags deployed, yes or
11        no?
12   A    I have no evidence that they did.
13   Q    Do you have any evidence that they didn't?
14   A    No, sir.
15   Q    So you don't know if they deployed.
16   A    I presume, based on my looking at the
17        photographs that they did not.
18   Q    At the photograph, is there more than one?
19   A    No, excuse me, that one that I saw.
20   Q    When you inspected the trailer that was
21        involved in the accident, did you weigh the
22        trailer?
23   A    No, sir.
24   Q    Was there anything keeping you from weighing
25        the trailer?
```

1   A   Simply the condition and location of the
2       trailer were not conducive to weighing it.
3   Q   Okay.  Do you -- did you request that it be
4       moved and weighed?
5   A   No, sir,
6   Q   Would the weight of the trailer, the exact
7       weight of the trailer make a difference in your
8       analysis?
9   A   Not a meaningful one.
10  Q   Well, what's an un-meaningful one?  What would
11      it -- what would it change?
12  A   Sure.  We -- it would change, for example, the
13      accelerations of the -- of the Ford.  It might
14      change them from just one 1g to about 1.2g's.
15      And the longitudinal acceleration of the Ford
16      from about 1 and a half g to about 2g',
17      depending on the weight, ranging all the way
18      from 2,000 to 4,500 pounds.
19  Q   So it changes the forces on the people in the
20      accident, the weight of the trailer?
21  A   Sure.
22  Q   Do you know how much the ATV weighed?
23  A   I don't know that as I sit here.  And again,
24      when I talk about the trailer, it's the
25      composite weight of the entire trailer.

1   Q    That means with the stuff on it.

2   A    Yes.

3   Q    Okay.  But do you know how much the mower

4        weighed?

5   A    No.

6   Q    Do you know how much the ATV weighed?

7   A    No.

8   Q    And  you don't know how much the trailer

9        weighed.

10  A    Correct.

11  Q    Now, with regard -- since you didn't inspect

12       the Ford and you didn't inspect the GMC, I'm

13       assuming you didn't download the ECM data.

14  A    Correct.  The -- the -- we did not download the

15       ACM data of the GM or the Ford.

16  Q    Did you ever request to download it?

17  A    No, sir, it made no sense to request a

18       download.

19  Q    Okay, and why is that?

20  A    Two reasons.  Number one is, the Ford being a

21       non-contact vehicle, the Ford -- there is no

22       reasonable expectation that there's going to be

23       a deployment in the air bag of that vehicle --

24       excuse me, there's going to be no recording.

25       Because it takes a meaningful -- takes a

|    |   |                                                              |
|----|---|--------------------------------------------------------------|
| 1  |   | meaningful change in speed of at least five                  |
| 2  |   | miles an hour over 150 milliseconds in order                 |
| 3  |   | for there to be a recording.                                 |
| 4  | Q | But you're assuming that the Ford did not have               |
| 5  |   | that because you assume that and didn't                      |
| 6  |   | download the data.                                           |
| 7  | A | No, sir, not assume.  We preformed analyses                  |
| 8  |   | that showed small accelerations and essentially              |
| 9  |   | no --                                                        |
| 10 | Q | Let me ask you this question, if I --                        |
| 11 |   | MR. LAVELLE:                                                  |
| 12 |   | Excuse me, let him finish his answer,                        |
| 13 |   | please.                                                      |
| 14 | MR. CAUBARREAUX:                                                  |
| 15 | Q | If I went download the data and it shows that                |
| 16 |   | there was a event, would your analysis then not              |
| 17 |   | be correct?                                                  |
| 18 | A | If the dynamics of that event and the time of                |
| 19 |   | that event and everything of that event was                  |
| 20 |   | consistent with this accident, then yes.                     |
| 21 | Q | So if we downloaded the data and it showed that              |
| 22 |   | there was an event consistent with this                      |
| 23 |   | accident, your analysis here would be flawed?                |
| 24 | A | And that shows -- that showed something                      |
| 25 |   | different -- meaningfully different than this                |

1    analysis, then yes, sir, it would be.

2    Q    Okay.  How about the GMC data?

3    A    The GMC data, also there was no reasonable

4         expectation of a -- of an event because that

5         GMC is an older vintage GMC, that if it has a

6         recording, that recording would be cleared

7         within 250 ignition cycles.  If that vehicle is

8         being used on a routine basis, there is

9         literature that tells us that vehicles that are

10        used routinely undergo six to seven ignition

11        cycles per day.  So in about 40 days after the

12        accident, you can reasonably expect that the

13        data would be gone.  Now, being that we're

14        engaged so much after the accident, there's no

15        reasonable expectation that there will be

16        recording there.

17   Q    Do you know if the vehicle was parked, totaled,

18        sitting there for two years in a corner of some

19        shop, do you know that?

20             MR. LAVELLE:

21                  Which vehicle?

22             MR. CAUBARREAUX:

23                  The GMC.

24             THE WITNESS:

25                  I do not know that specifically.

1   MR. CAUBARREAUX:

2   Q    Did you ask?

3   A    No, sir.

4   Q    Did you request information regarding that?

5   A    No, sir.

6   Q    If likewise, if that data is available, is it

7        important in an analysis like this?

8   A    If it were to exist, it could reasonably be.

9   Q    Okay.  Well, let me ask you this question,

10       let's take the defendant driver's testimony is

11       true that he hit the trailer going 20 miles an

12       hour, --

13  A    Yes, sir.

14  Q    -- would that record an event on a GMC such as

15       this?

16  A    It might.

17  Q    What would cause it not to?

18  A    Well, ultimately, it's the interaction between

19       the two vehicles.  I don't know what the exact

20       delta-V there is.  And those older GM models

21       did not have set numbers to get an undeployment

22       event.

23  Q    What would a delta-V be of a GMC running into a

24       trailer that just stopped in the road --

25       crossing the roadway, is that pretty simple to

1      analyze?

2  A   No, it depends on the weight distribution and

3      the weight of the other vehicle.

4  Q   Which you don't know.

5  A   Again, I have -- I don't know specifically.

6      I've calculated -- I've done a range of

7      calculations with the range of weights for that

8      trailer.

9  Q   So you ranged all this weight -- or some of --

10     can you tell me what the delta-V's would be in

11     your range?

12 A   For that, the delta-V's would be -- I can't

13     tell you as I sit here because I just -- I just

14     don't have that calculation in front of me.

15     But if you're looking at a vehicle that weighs,

16     let's say, 4,000 to 4500 pounds and it gets hit

17     by another vehicle at 20 miles an hour, it

18     would probably be somewhere in the range -- and

19     again, hits it sideways -- 10/12 miles an hour,

20     maybe.

21 Q   Okay, so it would cause the trailer that's

22     parked in the road to be -- have 10 to 12 miles

23     an hour of force exhibited on it?

24 A   For the -- it would cause the GM to slow down

25     by that much and to rotate the trailer.

```
 1   Q    Okay.  So you don't have any of the
 2        calculations with you?
 3   A    Correct.
 4   Q    Are these calculations on this jump drive you
 5        gave me?
 6   A    Yes, sir.  The whole simulations are there.
 7   Q    All right.  Well, let me ask you this question,
 8        you looked at this whole scenario, do you have
 9        an opinion as to who caused this accident?
10             MR. LAVELLE:
11                  Object to the form of the question.
12             MR. CAUBARREAUX:
13                  You an answer it.
14             THE WITNESS:
15                  I don't have an independent opinion who
16             caused the accident.
17   MR. CAUBARREAUX:
18   Q    You don't have -- you're an accident
19        reconstructionist and you don't have an opinion
20        of what caused this accident?
21   A    I said I don't have an independent opinion.
22   Q    What would cause you to have an independent
23        opinion?
24   A    To have done a complete analysis.
25   Q    Okay, and what would a complete analysis be?
```

```
 1   A    Something -- to do an analysis just beyond
 2        reading the accident report.  I mean, this is
 3        as far as -- as far as -- as that is, I have no
 4        reason to believe that it's any different than
 5        what the -- than what the officer identified.
 6   Q    Okay, I guess this is a dumb question, but how
 7        can you do a non-complete analysis of an
 8        accident reconstruction to garner information
 9        with regard to the kinetics of -- then the
10        movements of an occupant in another vehicle
11        when you didn't do the complete analysis to
12        determine what really happened?  You're giving
13        an opinion, an expert opinion about somebody's
14        body moving this way or that in a car, however,
15        you didn't do a complete analysis of it.
16             MR. LAVELLE:
17                  Object to the form.
18   MR. CAUBARREAUX:
19   Q    Is that a dumb question?
20   A    No, it's not a dumb question.
21             MR. LAVELLE:
22                  It's an argumentative one.
23   MR. CAUBARREAUX:
24   Q    Well, it's -- you need to do an analysis to get
25        to the bottom of what happened in the accident,
```

```
 1          right?
 2   A      Well, that -- what happened is different
 3          questions provide different answers.  And the
 4          question that I'm looking at is strictly on the
 5          kinetics, on the motions of the vehicles, and
 6          of its occupants.  I did not do an independent
 7          at-fault analysis.  Now, if the officer -- if
 8          the officer concluded that the driver of the
 9          GMC was at fault, I have no reason to contest
10          that.
11   Q      Did you see anything that would tell you
12          otherwise in this analysis?
13   A      No.
14   Q      Okay, let's go through your report a little bit
15          if we can.  You indicated in the report that
16          the accident happened on Highway 165 and 167,
17          correct?
18   A      Yes, sir.
19   Q      Which road was Mr. Killian on?
20   A      Mr. Killian was on the southbound exit ramp
21          from US 167 and turning northwards into 165
22          northbound.
23   Q      Okay.  Now, he was attempting to turn left onto
24          US 165, correct?
25   A      Yes, sir, going --
```

```
 1   Q    The scale, I guess, is wrong.  Is this a copy
 2        of the accident report diagram in your report?
 3   A    Yes, sir.
 4   Q    That you like, blew up?
 5   A    Yes, sir.
 6   Q    And you have the vehicle number one, which
 7        would be the GMC --
 8   A    Yes, sir.
 9   Q    -- proceeding  on 165.
10   A    Yes, sir.
11   Q    Okay.  Now, you have in your report, "Both
12        vehicles entered the intersection attempting to
13        turn left."  Where did you get that from?
14   A    I guess I -- it should have been just Mr.
15        Killian vehicle, not the other one.
16   Q    So that's incorrect.
17   A    It appears that way.
18   Q    The vehicle driven by vehicle number one -- the
19        vehicle number one was attempting to go
20        straight, correct?
21   A    Yes, sir.
22   Q    That was your understanding.
23   A    Yes.
24   Q    And in an attempt to try to avoid hitting the
25        trailer or Mr. Killian, the driver of vehicle
```

```
 1        one attempted at the last moment to turn right
 2        --
 3   A    Veer right, yes sir.
 4   Q    -- veer right, and that's when the impact
 5        occurred.
 6   A    Yes, sir.
 7   Q    Then you cite in here, I'll get to that now, I
 8        guess -- I'm just going down your report, you
 9        retained to look at the dynamics of the
10        accident and determine the motions and
11        mechanisms that the Ford's occupants sustained
12        in relation to their injuries they had claimed.
13        That's what you were hired to do, correct?
14   A    Yes, sir.
15   Q    And that you conduct work and invoice at the
16        rate of Four Hundred Forty-Five Dollars
17        ($445.00) an hour.  How much did you invoice in
18        this case?
19   A    I don't know that as I sit here.
20   Q    Is that on this little jump drive?
21   A    Yes, sir.
22   Q    Were you provided any other information after
23        your analysis and report?
24   A    I don't think -- I don't think I have.
25   Q    Like the policeman's deposition, the police
```

```
 1        officer's deposition?
 2   A    I don't know if I received that since.
 3   Q    Okay.   So your opinions are based on all the
 4        information that you were given, which would
 5        have been -- I'll tell you what, tell me what
 6        information you were given to review.
 7   A    The information within the basis of the report,
 8        which starts on page 18.   It's the information
 9        that is listed there.
10   Q    That would be the crash report, ten
11        photographs, some of which are not in your
12        report.
13   A    Correct.
14   Q    And those are on this little jump drive you
15        gave me before the deposition?
16   A    Those ten photographs would not be there
17        because those were within the production of
18        documents.
19   Q    Okay.   What ten photographs did you look at?
20   A    It was ten photographs that were within the
21        production -- the documents that were produced
22        between the parties.   So I don't know those
23        specifically.
24   Q    Can you -- are those archived somewhere?
25   A    They would be within the files, within the
```

```
 1          documents that were provided to us. Normally we
 2          don't -- we don't regurgitate those in the
 3          materials that we --
 4    Q     Well, I asked for all of that information in
 5          the subpoena.  That wouldn't be on this jump
 6          drive?
 7    A     I don't think it is.
 8    Q     Okay, can I get a copy of those from someone?
 9    A     Yes, sir.
10    Q     Okay, can you provide them to your counsel and
11          he can send them to me?
12    A     Yes, sir.
13    Q     That would be fine, thank you.
14               You looked at one photograph of the
15          Chevrolet; ten photographs of the trailer; the
16          repairs to the trailer; autostats dimensional
17          data for the Ford and Chevy; the trailer was
18          inspected by James Sprader of Rimkus.  Did you
19          actually go and look at the trailer yourself?
20    A     No, sir, Mr. Sprader, who's one of my
21          colleagues, looked at the vehicle.
22    Q     Okay, so earlier when I asked if you looked --
23          inspected the trailer, the answer is no, you
24          did not inspect the trailer.
25    A     I did not personally inspect the trailer, one
```

1    of my colleagues inspected it on my behalf.

2  Q  So by "you," for me that means us.

3  A  Not -- not the individual.

4  Q  For future reference, when I ask you, I don't

5     mean us, I mean you specifically, okay.  And if

6     you need to clarify that, please do.  But you

7     means you as far as I'm concerned.

8  A  Okay.

9  Q  You looked at the transcript of Mr. Killian's

10     deposition; you looked at medical records for

11     Mr. Killian; transcript of Ms. Banes'

12     deposition; and medical records for Ms. Banes;

13     and various materials were referenced,

14     including, and you list a bunch of treatise

15     articles and whatnot.

16  A  Yes, sir.

17  Q  Did you look at any causation letters with

18     regard to Ms. Banes or Mr. Killian from their

19     orthopedic surgeon or neurosurgeon?

20  A  Not if they were not contained -- not if they

21     weren't contained within the medical records.

22  Q  Do you recall looking at causation letters with

23     regard to Ms. Banes and Mr. Killian from a

24     neurosurgeon and an orthopedic surgeon?

25  A  No, sir, I don't recall as I sit here.

```
 1   Q    Are all of the materials that were provided to
 2        you for your review, and all of the medical
 3        records on this jump drive that you gave me
 4        before the deposition?
 5   A    No, sir.  As I said, the materials that were
 6        provided to me are not -- are not regurgitated
 7        there.  But I'd be happy to provide those.
 8   Q    Okay.  You received this subpoena, you were
 9        served with it, and I understand Mr. Lavelle
10        says that he didn't receive it.  And if he
11        didn't, I -- we retain any rights you have, I'm
12        not trying to box you in. But I just want to
13        ask this for future reference.  I asked you for
14        all of -- copy of all documents that you were
15        provided from any attorney or third-party in
16        connection with your work in this case.  That
17        would mean all medical records, anything that
18        you got from anyone to help formulate your
19        opinion.
20   A    Yes, sir.
21   Q    Is there anything other than the photographs
22        and the medical records that you reviewed that
23        is not on here?
24   A    In there, generally, materials that were purely
25        furnished to -- that are part of the discovery
```

```
1       process are not in there.

2   Q   What else was exactly -- I mean, this list you

3       gave us, but we don't know what's in it.

4   A   What's in there is basically the materials that

5       we have provided, that we have generated, that

6       we have provided, that we have reviewed, other

7       than the things that were a part of the

8       discovery process.

9   Q   I don't understand what that means.

10  A   Sure. Simply, the materials that we generated,

11      that I generated, our inspection photographs,

12      our calculations, a copy of our report, et

13      cetera, the correspondence and so on, those

14      materials are there.

15  Q   But the information that was sent to you to

16      start your analysis is not in there.

17  A   Correct.

18  Q   Okay.  If I can get a copy of all of that.

19  A   Yes, sir.

20  Q   Okay, thank you.

21          MR. LAVELLE:

22              All right, so I understand, you're

23          talking about like if I sent you the

24          responses to the request for production and

25          interrogatories, you have those but they're
```

```
 1              not on the thing?
 2         THE WITNESS:
 3              Correct.
 4         MR. LAVELLE:
 5              So example, the police report, I know I
 6         sent you that, would that be on that?
 7         THE WITNESS:
 8              No, the police report would not be
 9         there.  So strictly materials that were
10         sent to us that are generally part of a
11         discovery process are not contained there.
12   MR. CAUBARREAUX:
13   Q    I want to know what you looked at.  You
14        formulate an opinion, I want to know what you
15        looked at to formulate it.  And I don't know
16        that 'cause the defense lawyer didn't send me a
17        copy of that.  So I'm trying to find out what
18        you looked at and what you used to help make
19        your determination.  So that's the purpose of
20        that.
21   A    Understood.
22   Q    Okay, if you can get that here -- a copy of
23        that on another jump drive, even, or send him
24        two of them and I'll -- forward one to me.
25   A    I can do that, or I can send the link to our --
```

```
 1        our exchange.
 2   Q    Whatever's easiest.
 3   A    The materials that we reviewed are listed in
 4        the basis of the report, sir.
 5   Q    I don't want to be argue -- arguing with you,
 6        but when you say "I looked at medical records,"
 7        I don't know what that means.  Medical records
 8        are this thick.  So did you look at this much
 9        medical records, did you look at all of the
10        medical records, did you look at summaries of
11        medical records, what did you look at?
12   A    Understood.
13   Q    Okay?
14   A    Sure.
15   Q    Then you get to the conclusions, that's the
16        second -- page 2 of your report.  "There was no
17        direct contact between the Chevrolet and the
18        Ford."  You mean that because the Ford was
19        connected to the trailer with -- that was
20        contacted, there's no actual physical contact
21        made between the actual Ford truck and the GMC?
22   A    Yes, sir.
23   Q    Okay.  Now, you have, "The Ford was coupled to
24        a trailer via hitch connection.  This type of
25        connection has limited ability to transmit
```

```
 1        dynamic motion to the Ford."  What exactly does
 2        that mean?  So I'll ask this question, let's
 3        say the Ford is parked sitting there at a red
 4        light and the GMC runs into the back of the
 5        Ford, is the motion going to be transferred to
 6        the Ford?
 7   A    You mean, back -- to the back of the trailer?
 8   Q    To the back of the trailer, to the back of the
 9        Ford.
10   A    The short answer is mostly yes.  So
11        longitudinal forces, sure; lateral forces, not
12        to the same degree.
13   Q    So we're talking about longitudinal and lateral
14        forces here.
15   A    Yes, sir.
16   Q    One is being pushed from the back or the front?
17   A    Yes.
18   Q    And one's being pushed from the side, either
19        side back or forth?
20   A    Yes, sir.
21   Q    Were there longitudinal and -- were there both
22        forces in this collision, according to you?
23   A    Yes, sir.
24   Q    How are those forces created in an impact such
25        as this?
```

1   A   That's -- I can't answer that question, it's
2       not very clear.
3   Q   Okay.  A GMC Suburban hitting a trailer from
4       the side, what type of forces does it put on
5       the truck pulling it?
6   A   Well, we have -- we have to start -- when
7       you're showing me, you're showing a direct 90
8       degree impact.  So this is a little bit
9       different from that.  There's more of an angle
10      here, from front to back.
11  Q   Angle from who?  From which vehicle?
12  A   The angle between the trailer and the GMC --
13      the Suburban.  So the Suburban is attempting to
14      turn right, that's why it hits -- it hits at an
15      angle in the trailer.  So it actually puts a
16      rearward directed force on the trailer.
17  Q   Uh-huh.
18  A   And those forces are transmitted, for the lack
19      of a better term, I'll say more or less
20      efficiently in the longitudinal direction.  The
21      lateral forces, not so much, because now the
22      vehicle starts to swing around.  And so instead
23      of all of its lateral force being transmitted
24      to the Ford, what it does, it starts yawing
25      because it's being controlled, or limited its

```
 1        motion by the front.
 2   Q    It's your opinion that the trailer swung out
 3        from the back of the GMC, away from the GMC?
 4   A    It would move -- it would swing out away from
 5        the GMC during the contact.
 6   Q    You'd agree with me in looking at photographs,
 7        since you didn't look at the trailer, that the
 8        utility trailer being used, the tires are not
 9        accurately reflected as the position on the
10        trailer body, correct?
11   A    Correct.
12   Q    They're moreso in the middle, are they not?
13   A    Yes, sir.
14   Q    So we know that the front tire and the back
15        tire were hit -- impacted.
16   A    Yes, sir.
17   Q    And we know that while the impact was
18        happening, the GMC was attempting to go right.
19   A    Yes, sir.
20   Q    In your report you also say that Mr. Killian
21        was braking at the time.
22   A    Yes, sir.
23   Q    Where did you get that he was braking?
24   A    Oh, actually, let me -- I need to go where I
25        said that 'cause I think he actually said that
```

| | | |
|---|---|---|
| 1 | | he was accelerating.  Can you help me? |
| 2 | Q | I'll find it for you, I thought you knew. |
| 3 | A | No. |
| 4 | Q | Okay, so I'll find that in a minute. I want to |
| 5 | | go through the entirety of your report.  But |
| 6 | | let's assume that Mr. Killian is accelerating. |
| 7 | A | Yes. |
| 8 | Q | Okay.  And the vehicle that -- the GMC that |
| 9 | | hits the center of the trailer is trying to |
| 10 | | stop and he's trying to pull away.  What is |
| 11 | | that going to do to the forces on the trailer |
| 12 | | at the time of the accident?  It's going to try |
| 13 | | to push it backwards? |
| 14 | A | Yes. |
| 15 | Q | Do you know if it was going to try to yaw the |
| 16 | | back of the trailer, or if it was going to try |
| 17 | | to yaw the front of the trailer over? |
| 18 | A | Well, when it hits it over the tires, it's just |
| 19 | | pushing it, and the result is a yaw. |
| 20 | Q | Okay.  Do you know if the truck itself was |
| 21 | | pushed, as well? |
| 22 | A | The truck -- the Ford? |
| 23 | Q | Yes. |
| 24 | A | It would not be, because the trailer would |
| 25 | | rotate about the hitch.  They would experience |

```
 1        a shaking motion, certainly.
 2   Q    I think you have it a vibration.
 3   A    Sure.
 4   Q    Okay.  What you said was not significant here
 5        at all.
 6   A    It would not be significant in terms of a real
 7        potential to cause -- to cause just meaningful
 8        motions of the occupant.
 9   Q    Okay.  You have that, "This collision would
10        have a character similar to a sideswipe with a
11        shorter time duration."
12   A    Yes.
13   Q    Okay.  How do you get an intersectional t-bone
14        collision with one vehicle hitting another and
15        equate that to a sideswipe?
16   A    The way that you equate it with a sideswipe is
17        in a sideswipe, the vehicle has -- the vehicle
18        shakes.  Whereas in a t-bone, in a proper t-
19        bone, then the vehicles have undergo a
20        meaningful net motion.  The trailer certainly
21        would have a net motion.  So if there was
22        somebody sitting in the trailer or in a vehicle
23        such as a trailer, then absolutely.  But as I
24        mentioned before, what would happen is there
25        would be a shortly -- short lived acceleration
```

```
 1        pulse that would be transmitted through the
 2        hitch as the trailer started moving.  And
 3        that's why you made the analogy between that
 4        and a sideswipe, because you have a short
 5        acceleration pulse with no meaningful net
 6        motion of the vehicle.
 7   Q    So if someone is on the trailer, on this
 8        trailer during this accident, the motions are -
 9        - the energy transferred to the occupant of the
10        trailer, there would be significant forces to
11        cause the injuries that they complained of, is
12        that what you're saying?
13   A    No.  No.  What I'm saying is that there would
14        be meaningful motions of the vehicle, and there
15        would be meaningful motions of the occupants in
16        the trailer, had there been someone in the
17        trailer.  The trailer, as it swings right, the
18        occupant would be -- tend to go left inside the
19        trailer -- inside the vehicle --
20   Q    In this meaningful motion to cause what?
21   A    It would have some potential to cause injuries.
22        Now, I didn't do a delta-V, but there would be
23        some meaningful potential to cause injuries if
24        we are looking just at the dynamics of the
25        trailer.
```

```
 1   Q    Okay.  So if someone's in the trailer, there's
 2        significant motion here to cause -- or
 3        meaningful motion here to cause injury, but
 4        not to the truck that's connected to the
 5        trailer.  That's basically it, right?
 6   A    In a big picture, the motions would be much
 7        lesser in the truck and the potential for
 8        injury would be much less.
 9   Q    And then you have, "Occupants" -- number three
10        here, "Occupants of the Ford would have
11        experienced minor motions within the vehicle.
12        And the accelerations would be well within
13        levels experience due -- during routine
14        activities of daily living."
15   A    Yes, sir.
16   Q    So this accident, you think is the same as
17        sitting in a chair and all that kind of stuff.
18        I've seen those --
19   A    It's not the same.  The magnitude of the
20        accelerations and hence, the inertial loads of
21        the occupants would be within the range of what
22        people undergo routinely.
23   Q    Okay.  Well, you have this sideswipe, and it's
24        painted red, and this is exhibit -- figure
25        number one.
```

```
 1           MR. LAVELLE:
 2               What page is that on?
 3           MR. CAUBARREAUX:
 4               It doesn't have a page number, it's in
 5           the attachments following the photographs.
 6  MR. CAUBARREAUX:
 7  Q    Now, what's the purpose of red, is that what
 8       you're saying this accident is?
 9  A    It would be the equivalent of this accident, or
10       the range of this accident.
11  Q    So the same thing as sitting in a chair?
12  A    It would be coming down to sit into a chair.
13           MR. LAVELLE:
14               So not saying --
15           THE WITNESS:
16               Not sitting quietly, but just in the
17           process of coming down, sitting down into a
18           chair.
19  MR. CAUBARREAUX:
20  Q    And that's a compressive load.
21  A    Yes, sir.
22  Q    What about longitudinal or lateral loads of a
23       person's spine, is that indicated in this, or
24       no?
25  A    It is not.  And for a sideswipe, I need to
```

```
 1          correct that because it is the result, which is
 2          the sum of squares of compressive, plus the
 3          lateral, plus the longitudinal.
 4     Q    So this -- you're trying to say with this
 5          diagram that being in this accident is
 6          equivalent to sitting down in a chair.
 7     A    The dynamic -- the dynamic accelerations of the
 8          head and neck would be, yes, sir.
 9     Q    So to do that we have to say that you don't
10          believe that Mr. Killian is telling the truth
11          that they were pushed about 15 feet in the
12          truck?
13     A    Not in terms of do I believe or not.  I would
14          say that --
15     Q    You said it under oath, it's whether -- and
16          you're saying no, that didn't happen, and
17          you're telling me you didn't do a full
18          evaluation in accident reconstruction, so I
19          want to know how you get that.  Either he's
20          lying, it's impossible, I need to know.
21               MR. LAVELLE:
22                    Object to the form of the question. You
23               can answer.
24               THE WITNESS:
25                    Before I answer, I would really
```

```
 1              appreciate it if you let me finish my
 2              answers.
 3   MR. CAUBARREAUX:
 4   Q    Okay.
 5   A    I can't place belief or not in a single
 6        individual, that is not my role.  What I can
 7        say is whether somebody's statement is or is
 8        not consistent with the dynamics of the
 9        accident.
10              Now, if we look at a base level of a
11        vehicle that is turning and another vehicle
12        that is hit -- hitting it in the generally
13        rearward direction, it cannot push it, it can
14        only slow it down, in terms of the longitudinal
15        -- now, if he moved that further distance, it's
16        not because of the impact, it is because of his
17        pre-impact velocity coupled with his post-
18        impact velocity.
19              So I'm not saying he's lying.  I never
20        would do that because I know that people have
21        different perceptions of what happens in the
22        accident.  But what I am saying is that if he
23        said that he was pushed forward due to an
24        accident that has primarily -- or that has in
25        the fore afformation a rear component, then
```

```
 1        that just is not consistent.
 2   Q    Okay, so let's assume if he was pushed sideways
 3        from this accident, okay, would that be
 4        significant force to cause a mechanism of
 5        injury for this person in the Ford truck?
 6   A    There are some injuries who's -- that have
 7        mechanisms that would be associated with a
 8        meaningful lateral component.  If there was a
 9        meaningful lateral component to the accident,
10        there certainly are some injuries that could be
11        consistent with that.
12   Q    Okay.  So if he was pushed sideways 15 feet, as
13        he testified to, there is a meaningful
14        component of force here to cause an injury?
15   A    Some specific injuries.
16   Q    Okay.  How about his injuries?
17   A    There would still be no meaningful compressive
18        loads to the spine.  There would be lateral
19        loads, which would certainly have the potential
20        to cause strains and sprains and that sort of
21        injury.
22   Q    Uh-huh, okay.  How about injuries to his
23        shoulder?
24   A    There's a potential for left contact injuries
25        to the shoulder.
```

```
 1   Q     Okay.
 2   A     To the driver's left shoulder.  Given those
 3         dynamics that we discussed, moving that vehicle
 4         laterally 15 feet.
 5   Q     "Spinal strains and sprains," this is number
 6         four, "would not be consistent with the
 7         dynamics of this accident."
 8   A     Yes, sir.
 9   Q     Now, are you a medical doctor?
10   A     I am not a medical doctor, and I do not pretend
11         to be one.
12   Q     Okay.  Is it fair to say, sir, that you're here
13         to give an opinion that the forces in the
14         accident could or couldn't cause injury --
15         could or couldn't injure certain tissues of a
16         body, is that what you're trying to do, and not
17         give a medical causation opinion?
18   A     Well, let's --
19   Q     Or are you trying to give a medical causation
20         opinion, that's my question, I guess.
21   A     Okay, so let -- number one, not a medical
22         opinion in any way, shape, or form.  Number
23         two, the role of the biomechanics is not to say
24         whether something could or could not.  When we
25         talk about could or could not, that puts us in
```

```
 1          the realm of possibility.  What we're looking
 2          at is consistency, not causation.  Whether the
 3          mechanics of the accident are consistent with
 4          the mechanics that are associated with specific
 5          damages to tissue, again, that then get
 6          translated as diagnosis by physicians.
 7     Q    Okay.  But that doesn't take into account the
 8          age of a person, the physical health of a
 9          person, all those different things, does it?
10     A    It does.
11     Q    It does, okay.  How does it?
12     A    Two ways.  Number one is, we take into
13          consideration the height and weight in
14          calculating the forces or the loads.  And
15          number two, when we discuss a person's age and
16          so on, there are some age-related changes in
17          the tissues that tend -- not just to make a
18          person more frail, but to change the potential
19          for injuries in some individuals as opposed to
20          others.
21               So for example, in the general aging, in
22          the regular aging process, there's an
23          expectation, for example, that the potential
24          for strains and sprains is going to increase.
25          The potential for disc injuries, or damages to
```

```
 1          the discs, does not necessarily go up in the
 2          same way.  It goes up to a small degree with
 3          very minor degeneration to a small degree, and
 4          then it tends to stabilize as degeneration
 5          becomes more advanced.
 6     Q    So you're not here to day that these --  Mr.
 7          Killian and Ms. Banes didn't get hurt in the
 8          accident, you're just here to say that you
 9          don't think it ruptured discs or caused any
10          shoulder injury?
11     A    No, I'm here to say that the mechanics of this
12          accident are or not conducive to the different
13          types of injuries that were diagnosed here.  I
14          can't say that Mr. -- Mr. Banes and -- excuse -
15          - Mr. Killian and Ms. Banes were not injured,
16          but what I can say is the types of forces that
17          they underwent in this accident are not
18          necessarily consistent with the types of forces
19          that cause those damages to those tissues.
20     Q    Okay, so the ultimate person in this case to
21          tell us whether or not they feel that they were
22          hurt and required whatever medical treatment,
23          would be the medical physicians that treated
24          them, correct?
25     A    Yes, sir.  I would not be -- I would not be
```

| | | |
|---|---|---|
| 1 | | arguing with physicians. |
| 2 | Q | With regard to the trailer itself, I saw you |
| 3 | | had an engineer that looked at it.  What was |
| 4 | | his name again? |
| 5 | A | Jim Sprader. |
| 6 | Q | Sprader, okay.  Did he do any type of analysis |
| 7 | | of how much force it would take to break that |
| 8 | | axle of that trailer? |
| 9 | A | No, sir. |
| 10 | Q | Did you ask him to? |
| 11 | A | No, sir. |
| 12 | Q | Did you ask him to do an analysis of what it |
| 13 | | would take to bend that -- those fenders and |
| 14 | | deflect all of the railing of the trailer to |
| 15 | | where it would bend all of that? |
| 16 | A | No, sir. |
| 17 | Q | Do you think that would be good information to |
| 18 | | get when you're trying to determine the actual |
| 19 | | speed of the GMC? |
| 20 | A | No, sir. |
| 21 | Q | It wouldn't be? |
| 22 | A | It wouldn't be meaningful. |
| 23 | Q | Okay.  Why would it not be meaningful? |
| 24 | A | Because it does -- it's not going to change the |
| 25 | | dynamics of the accident, other than include -- |

```
 1        other than increase the compliance of the
 2        system.
 3   Q    Let me ask you this, if that GMC hit that
 4        trailer going 45 miles an hour, you're telling
 5        me that it wouldn't change the dynamics of this
 6        accident?
 7   A    Oh, him hitting it at 40 miles an hour,
 8        certainly.
 9   Q    How about at 30 miles an hour?
10   A    It would be different than it would be at 40.
11   Q    Well, wouldn't it be a good thing to know what
12        force it would take to break this type of
13        metal, or bend this type of metal?
14   A    No, sir.  Because the force that it takes to do
15        any kind of damage is reflected in the impact
16        with the other vehicle.  And we are looking at
17        that through how much crush there is to the --
18        to the GMC.
19   Q    But you didn't inspect -- I get that, but you
20        didn't inspect that, you inspected the trailer.
21   A    Yes, sir.
22   Q    So since you didn't inspect the GMC and don't
23        know what crush did -- it did to it, how is it
24        that the forces on the trailer are not
25        sufficient to get, to determine the actual
```

1     forces that were placed on the trailer, since

2     you don't know what the GMC looks like, you

3     don't know what the air bag deploy, you don't

4     know if the undercarriage is destroyed, you

5     don't know any of that.  You have one picture.

6          MR. LAVELLE:

7               Let me object.  Hold on a minute.  You

8          have more of a statement together with

9          several questions in there, and I object to

10         you being argumentative with the witness

11         and raising your voice.  So let's just calm

12         down and take it step by step, okay?

13    MR. CAUBARREAUX:

14    Q   So you don't know -- you did not look at the

15        GMC vehicle, correct?

16    A   I did not physically look at the GMC vehicle.

17        We did have a photograph of the vehicle that

18        showed minimal indentation to the left front

19        corner.

20    Q   That's what the photograph to you says.

21    A   Yes, sir.

22    Q   Okay.  Do you know if there was any damage to

23        the side of the GMC, or to the other front

24        corner of the GMC?

25    A   No, sir, it was obvious that was an angle

```
 1        contact.  That just -- that's just outside of
 2        the point of contact of the vehicle.
 3   Q    My point is, since you don't know -- you don't
 4        know from looking at the GMC, don't have the
 5        downloaded data from the GMC, you don't have
 6        any of the information from the GMC other than
 7        a picture, and you were able to look at the
 8        trailer.  My question to you is, why wouldn't
 9        you want to try to get as much information with
10        the forces required on the trailer to cause the
11        damage that you did have someone go look at in
12        determining the speed of the vehicle?
13   A    Because I work with information that I have and
14        that's not necessarily germane.  There are no
15        good information databases to tell us how much
16        force it takes to cause that axle damage.
17        There are good -- there are good databases that
18        tell us about how much crush it takes to push
19        in the side -- the front of that GMC.  We know
20        the general dimensions of the bumper and we
21        know how far that got pushed in.  We know that
22        it was not the depth of the bumper itself, or
23        it was barely the depth of the bumper.
24   Q    So you know that from looking at that picture
25        how much damage was done to that GMC.
```

```
 1   A    How much crush there was to the front of the
 2        GMC, which is the one parameter that is
 3        relevant.
 4   Q    You have that, "The subject Ford reportedly no
 5        body damage except for minor damage to the
 6        connecting leaf springs."  Did you request to
 7        look at the vehicle -- the Ford to determine
 8        what force it would have taken to break the
 9        bolts for the leaf springs?
10   A    No, not inspection of that vehicle.  But this
11        is something that we have done a number of
12        times.
13   Q    What have you done a number of times?
14   A    Looked at when we had direct impacts to axle
15        and looking what kind of -- what kind of
16        severity of impact it takes to do that.  And
17        it's surprisingly low.
18   Q    On the truck itself?
19   A    Yes.
20   Q    Okay.  Do you know what kind of force it would
21        take to bend the receiver hitch on a pickup
22        truck?
23   A    I do.  I don't know as I sit here, but it's a
24        couple thousand pounds.
25   Q    So that's not significant to you, either.
```

```
 1   A    No.

 2   Q    Okay.  And the receiver hitch is connected

 3        directly to the frame of the truck, the Ford

 4        truck, correct?

 5   A    The hitch receiver is, yes, sir.

 6   Q    So in your report towards the bottom of page 5,

 7        you get, "Mr. Killian's vehicle then slid

 8        sideways for about 15 feet."

 9   A    Yes, sir.

10   Q    You would say on this accident, that's

11        impossible?

12   A    And I said that's not consistent with the

13        mechanics of this accident.

14   Q    That's not consistent with what you found,

15        based on your calculations.

16   A    With a non-contact event to that Ford.

17   Q    And then you have, "Mr. Killian claims that the

18        leaf spring on the trailer were broken and the

19        front axle of the trailer was bent as a result

20        of the accident."

21   A    Yes, sir.

22   Q    When you say "claims," what do you mean,

23        "claims"?

24   A    That means that he stated that.

25   Q    Well, would there be significant forces in your
```

```
1        opinion in this accident to break the bolts on
2        the leaf springs of his vehicle?
3   A    Possibly.
4   Q    Possibly, okay.  But you don't know how much
5        force that would take.
6   A    It would not take much force, sir.
7   Q    But you don't know how much force it would
8        take, do you?
9   A    Not as I sit here.
10  Q    Okay.   Ms. Banes also said the springs
11       underneath their pickup truck were damaged.
12       She also testified to that.
13  A    Yes, sir.
14  Q    If you would have done a complete accident
15       reconstruction analysis with measurements,
16       measured the length of the truck, measured the
17       length of the trailer, measured the roadways,
18       got out there and done all of those things and
19       did an actual recreation of the accident,
20       complete reconstruction, physically went and
21       looked at both vehicles to determine the actual
22       damage that was done to them, do you think you
23       would be in a lot better place with regard to
24       estimating the speed of the GMC when it hit the
25       trailer?
```

```
 1              MR. LAVELLE:
 2                   Object to the form of the question.
 3              You can answer.
 4              THE WITNESS:
 5                   Depending on a number of factors.  If
 6              it -- if that was done immediately where
 7              there still may be roadway evidence, then
 8              --
 9   MR. CAUBARREAUX:
10   Q    Like skid marks and things like that?
11   A    Correct.
12   Q    So if you would have seen skid marks pushing
13        the vehicle 15 feet sideways, that would have
14        changed your opinion here?
15   A    If I had seen said skid marks, then that would
16        factor into the opinions.
17   Q    And may potentially change it.
18   A    Well, it would be a basis for building opinions
19        on what is -- what is the ultimate analysis.
20   Q    Also, whether or not there's a grass median in
21        between these two roadways that are going east
22        and west and it would determine where the truck
23        could actually turn or not turn?
24   A    That may or may not influence.  It depends --
25        it would depend on a number of factors.  That
```

```
 1          may or may not be influential.
 2     Q    Let me ask you this question, with the truck in
 3          this diagram that you have, photograph number
 4          one, I think you call it on your report, it
 5          shows vehicle two beginning a left-hand turn,
 6          the trailer's still straight?
 7     A    Yes, sir.
 8     Q    If vehicle two was actually straight, even with
 9          the trailer coming across the median, would
10          that make any difference in your analysis?
11     A    It would simply change a little bit the
12          vectors, where there would be less longitudinal
13          component than more of a lateral component.
14     Q    Would that change whether or not somebody,
15          according to here, could have been hurt or not
16          hurt, but statistically sustained injuries to
17          their cervical spine and shoulder?
18     A    Not in a meaningful way.
19     Q    Not in a meaningful way, okay.  "Accident
20          reconstruction," you have on the bottom of 11,
21          "applies a scientific approach to evidence
22          available in order to determine the dynamics of
23          an incident with the purpose of finding facts
24          related to vehicle positions."  So we don't
25          have those, meaning skid marks and actual yaw
```

```
 1        marks, gouge marks in the roadway, correct?
 2   A    Yes.
 3   Q    Relative speeds.  We just have testimony of the
 4        defendant driver saying I was going 20 miles an
 5        hour.
 6   A    Yes.
 7   Q    We didn't download any of the data from that
 8        vehicle, or inspect that vehicle.
 9   A    We didn't download of any other data that
10        there's no reasonable expectation might exist.
11   Q    But we didn't do it.
12   A    Correct.
13   Q    And we don't know the actual vehicle damage
14        other than looking at the photograph.
15   A    Correct.
16   Q    "Within the context of this analysis, an
17        accident cause analysis and at-fault
18        determination were not concluded.  Further, the
19        accident reconstruction was limited to the
20        point in time immediately before to immediately
21        after the vehicle-to-vehicle contact in order
22        to determine the forces and motions on the
23        vehicle to support the subsequent biomechanical
24        analysis."  Okay.
25             Now, you said that the trailer would have
```

```
 1        rotated clockwise.
 2   A    Counterclockwise.
 3   Q    Counter -- I'm sorry.  I'm sorry, "The trailer
 4        yawed, spun, counterclockwise, viewed from
 5        above."  So you're saying that the back end of
 6        the trailer went, I guess it would be west.
 7   A    Rotated around, yes, sir.
 8   Q    Okay.  If this impact was further up to the
 9        middle of the trailer, would it then make the
10        back of the trailer yaw counterclockwise?  Do
11        you understand what I'm asking?
12   A    I do, but I think that you misspoke so I'm not
13        quite sure.  Because you said counterclockwise
14        --
15   Q    Clockwise, I'm sorry.
16   A    Not if it hit the trailer.  If it hit the
17        trailer, it would not make it rotate clockwise,
18        simply because the one fixed point on the
19        trailer, or generally fixed point on the
20        trailer is the hitch.  So --
21   Q    Which is connected to the truck.
22   A    Correct.  So as long as it remains connected to
23        the truck, an impact to the trailer will yaw it
24        counterclockwise.
25   Q    No matter what?
```

```
 1   A   Yes.
 2   Q   If it hit closer to the back of the -- closer
 3       to the back of the truck, the front of the
 4       trailer, --
 5   A   Yes.
 6   Q   -- would it cause both vehicles to move in a
 7       lateral direction?
 8   A   There would be a point where it would make both
 9       vehicles move in a -- in a lateral direction.
10   Q   Could that have happened here and both Mr.
11       Killian be telling the truth that he was pushed
12       sideways 15 feet?
13   A   No, because of the impact was at the axle, so
14       it would push the tires proper.  In order for
15       that to happen, it would have to be far enough
16       to where those tires are providing enough
17       support to give the trailer a rotation towards
18       the -- clockwise rotation.  So because of the
19       accident, or the impact happens right at the
20       axles, it will push the axles such that it
21       rotates counterclockwise.
22   Q   And the axles actually protrude from the
23       outside of the trailer, correct?
24   A   Yes.
25   Q   Do you know if, in looking at the photograph
```

```
 1        and in looking at the trailer, whether or not -
 2        - or looking at photographs of the trailer,
 3        whether or not the GMC was hung up in the
 4        trailer when it collided?
 5   A    They don't get hung up.  Accidents don't happen
 6        like that.  The vehicle would project away from
 7        the other one.
 8   Q    Okay.  Impossible for that to happen?
 9   A    I don't like using the word "impossible," but
10        it simply just does not go along with the
11        physics that are involved here.
12   Q    Now, you have, "A series of mathematical
13        simulations of the circumstances of the
14        accident were performed to assist the dynamics
15        of the accident."  Are those things on this
16        jump drive that you gave me before?
17   A    Yes, sir.
18   Q    When you download this data, are you -- is it a
19        database where it has two vehicles, or is there
20        a spot to upload information on a trailer?
21   A    I don't follow you.
22   Q    Well, it's telling -- I'm sure in this data
23        it's going to tell you what one vehicle weighs
24        and what the other vehicle weighs.
25   A    Yes.
```

```
 1   Q    We know what the GMC weighs, we don't know what
 2        the trailer weighs.
 3   A    Correct.
 4   Q    You know what the Ford weighs.
 5   A    Correct.
 6   Q    So my question is, is there a number to put in
 7        for that trailer?
 8   A    There's a series of numbers that when every 500
 9        pounds -- well, we use a series of numbers
10        because we don't know.  So we go from 2,000 to
11        4500 pounds.  So we don't use a trailer.  Or
12        you use a trailer and you repeat the simulation
13        putting different weights to the trailer.  And
14        that way you can understand how it's going to
15        affect the dynamics of the other vehicle.  And
16        then once you do that, you use the more severe
17        numbers that you have.
18   Q    Okay, maybe I'm asking a very bad question.  My
19        question is, when you're doing this electronic
20        simulation of data, you have to input numbers
21        as to the two vehicles, correct?
22   A    Yes.
23   Q    And what you're telling me is you put a
24        simulation of the GMC, and you put -- 'cause
25        you didn't know what the trailer weighed and
```

```
 1        all the stuff on the trailer weighed, you did
 2        some assumption that it weighs from here to --
 3        x to y.
 4   A    Yes.
 5   Q    And you did a bunch of different scenarios.
 6   A    Yes.
 7   Q    Is there a simulation that you did that has
 8        vehicle one, GMC, vehicle two, trailer, vehicle
 9        three, truck connected to trailer?
10   A    They should be there, yes, sir.
11   Q    So that's on this jump drive?
12   A    They should be.
13   Q    And if they're not, they weren't done?
14   A    No, they were done.  They should be there.  If
15        they're -- if they're not, I'd be happy to
16        recreate them because they should be there.
17   Q    Okay.  Earlier you testified that all of the
18        data that you did that you performed is on this
19        jump drive.
20   A    Yes, sir.
21   Q    After this deposition I'm going to go look at
22        this.
23   A    Sure.
24   Q    I didn't get it before so I didn't have the
25        opportunity.  Is there some other data out
```

```
 1         there, or calculations that you did that are
 2         not on this jump drive?
 3   A     Not that I'm aware of.
 4   Q     So in formulating this opinion that's written,
 5         that we're deposing you about today, all of
 6         that information is on this jump drive?
 7   A     It should be there.
 8   Q     I have a problem with the "should" part.
 9   A     Well, sir, we do our best to preserve
10         everything we do, but it certainly can happen
11         that some simulations may be done that don't
12         show up there.  But for data that is presented,
13         there should be a simulation there.  I expect
14         that they would be there.
15   Q     Had you done any calculations with regard to
16         the weight of the trailer versus how it affects
17         the truck and the occupants in the truck when
18         there are forces placed on the trailer itself?
19   A     Yes, sir.  And there's going to be a specific
20         PDF on that, which is what I have -- I've be
21         referring to that as we've been in the
22         deposition.
23   Q     So does a lighter -- just for brevity -- does a
24         lighter trailer being hit in a similar way
25         affect the truck pulling it less or more?
```

```
 1   A      It sounds like a straightforward question and
 2          it isn't.  The answer is that the lighter it
 3          is, the less it affects it in the lateral way.
 4          But -- excuse me, yeah, the lighter it is, the
 5          less it affects it on the lateral way.  But it
 6          affects it more in the longitudinal direction.
 7          So it shifts -- a lighter trailer will shift it
 8          to the side less, and fore and back more.
 9   Q      Shift the truck to the side less?
10   A      Yes.
11   Q      And where --
12   A      Or it will in part that acceleration to the
13          truck less severe or more severe.
14   Q      And a heavier trailer would cause those forces
15          to do what?
16   A      Heavier trailer would have a more severe effect
17          on the lateral dimension.  A less severe effect
18          on the longitudinal dimension.
19   Q      Okay.
20   A      But by the way, we're talking about fairly
21          modest changes here.  So from .8 to -- to about
22          .8 something to about 1.2 g's in the
23          longitudinal -- in the lateral direction, and
24          from about 2 g's to 1.4 g's in the longitudinal
25          direction, okay.
```

```
 1   Q    And the occupants in this accident of the Ford
 2        are getting both of those --
 3   A    Yes, sir.
 4   Q    -- changes in movement, correct?
 5   A    Yes, sir.
 6   Q    Okay.  This is page 13, the top paragraph.
 7        "Simulations were completed for several
 8        possible braking scenarios, foot staying on the
 9        brake versus foot coming off the brake, and
10        braking effort, normal braking versus forceful
11        braking, for the subject Ford."  So this is
12        where I -- is this a clerical error, or is your
13        calculations regarding braking for the Ford at
14        the time of the accident, or accelerating at
15        the Ford at the time of the accident?
16   A    I need to check, sir, I don't know as I sit
17        here.
18   Q    Would it make a difference?
19   A    Very little.
20   Q    But we don't know how little.
21   A    Correct.
22   Q    But those analysis would be on here, on this
23        jump drive?
24   A    I expect that they will be, yeah.
25   Q    But if this report on page 13 is correct and
```

```
 1              the simulations were done with regard to
 2              braking, not accelerating, the data would not
 3              be correct; is that a fair statement?
 4    A    There would be some variances.
 5    Q    So it wouldn't be correct.
 6    A    There would be some variances.
 7    Q    Okay.  Could a delta-V analysis been done on
 8              the trailer and the Ford truck in this
 9              particular accident?
10    A    On the Ford truck, it does not give you a
11              delta-V analysis because it's a non-contact
12              vehicle.  And because of the nature of --
13              because the nature of the impact, it does not
14              give a delta-V analysis, it does give you --
15              there is a delta-V response for the trailer, as
16              there is for the Chevrolet.
17    Q    I have a problem with the analogy and maybe you
18              can explain it to me, of how a vehicle pulling
19              something -- pulling something gets hit and the
20              thing that it's pulling gets hit and it doesn't
21              -- it doesn't cause any issue, or what did you
22              call it?
23    A    I'm -- I don't know.
24    Q    The non-contact vehicle, you're putting the
25              truck that's connected to the trailer, the
```

```
 1            trailer gets demolished, totaled --
 2                  MR. LAVELLE:
 3                     Object to the form of the question.
 4   MR. CAUBARREAUX:
 5   Q     -- axle's ripped off, but you're saying it's a
 6         non-contact vehicle when they're connected.
 7   A     Correct, it's a non-contact vehicle.  They're
 8         coupled.
 9   Q     Okay.  And so if an 18-wheeler trailer, a guy
10         driving an 18-wheeler, his trailer gets run
11         through by a train and he doesn't get run over
12         because it didn't technically hit the tractor
13         that's pulling it, that's a non-contact
14         vehicle?
15   A     Contextually, it's a very different situation.
16         If there is net motion, then sure. But there is
17         no net motion.  That's the whole point.  There
18         is a short vibration  or acceleration.  The
19         vehicle shakes, but it does not move as a
20         result of impact.  So there is no delta-V.
21         That's why there's a mention that the idea of
22         delta-V is not applicable for this type of
23         accident.
24               THE WITNESS:
25                  Excuse me for a second before you ask
```

```
 1              the next question.  I'm somewhat thirsty
 2              and I didn't see any water here.  Do you
 3              mind if we take a five-minute break, I run
 4              downstairs and get water for everyone?
 5          MR. CAUBARREAUX:
 6                  I'm fine, get whatever water you need,
 7              I'm good.
 8                        -- BREAK --
 9   MR. CAUBARREAUX:
10   Q    All right, on page 14, you're talking about the
11        "occupants accelerations are damped by the
12        coupling of the occupant's mass and the seats
13        and are reduced by 60 percent in relation to
14        those of the vehicle."  What exactly does that
15        mean?
16   A    Sure.  When we have this -- the kind of side
17        acceleration that we have in such an accident
18        like this one, it's fundamentally different
19        than when we have, let's say, a rear end
20        impact.  When we have a rear end impact, the
21        person moves back, loads th seat back, and then
22        comes forward at a greater acceleration, at a
23        greater peak acceleration than the peak
24        acceleration of the vehicle.  When you have a
25        sideswipe, you have a sort of transient lateral
```

```
 1           frontal acceleration like you would have here,
 2           the acceleration of the vehicle is greater than
 3           the peak acceleration of the occupant.
 4    Q      Okay.  So they wouldn't move as much is what
 5           you're saying.
 6    A      Correct.
 7    Q      But in this case they are going to move forward
 8           when the GMC hits the trailer and is turning
 9           the opposite way of the trailer is going,
10           correct?
11    A      Yes.
12    Q      And they would also move laterally at the same
13           time with the yaw of the trailer.
14    A      Not with the yaw of the trailer.  They would be
15           going -- they would be going forward and then
16           towards the left.  So as you were showing me,
17           you were twisting your shoulders.  That's not
18           the type of motion that would happen here.
19           Rather than twisting your shoulder, they would
20           just move at an angle.
21    Q      Oh, okay.  You have, "Noteworthy," and I'm on
22           page 15 at the top, you said "Noteworthy for
23           Mr. Killian, disc bulging has been reported in
24           conjunction with other degenerative symptoms
25           including disc space narrowing, disc
```

```
 1          desiccation, osteophyte formation, and
 2          stenosis."  Are you talking about him, are you
 3          talking about statistics, or?
 4   A      No, generally, disc bulging has been -- so he
 5          had sort of a bulge where there was no fracture
 6          or dislocation or discreet prolapse, and that
 7          is something that is generally reported along
 8          with other degenerative effects, such as
 9          narrowing, desiccation, osteophytes, and
10          stenosis.
11   Q      You then have, "The specific mechanism for
12          degenerative disc bulging is chronic exposure
13          to repetitive loading, such as in occupational
14          lifting.  This is consistent with Mr. Killian's
15          occupation in the wood industry."  Are you
16          saying that you think his disc bulge that he
17          had is related to his work?
18   A      No, sir.
19   Q      What are you saying, then?
20   A      What I'm saying is that for someone who has
21          that occupation, there is a greater than
22          average expectation for there to be disc
23          bulging.
24   Q      Okay, but a disc bulge may have occurred in
25          this car accident, correct?
```

```
 1   A     The mechanisms to cause that were not present
 2         at this accident.
 3   Q     Okay.  So if Mr. Killian had an MRI taken a
 4         week before this accident that showed no disc
 5         bulging, and he got in this accident and a week
 6         after the accident had a disc bulge, it could
 7         not occur in this accident?
 8              MR. LAVELLE:
 9                   I'm going to object to the form of the
10              question.  It assumes facts not in
11              evidence.
12              THE WITNESS:
13                   We'll go back to the could not.  And I
14              do not say "could not," I would simply say
15              that the mechanics of the accident are not
16              consistent with conducing that type of
17              pathology.
18   MR. CAUBARREAUX:
19   Q     And again, you would defer to the medical
20         doctors who treated Mr. Killian to tell us what
21         was medically caused by this accident?
22   A     I would simply say that it's not a question
23         that I answer.
24   Q     So medical causation is not a question that you
25         answer.  Any questions regarding that, you're
```

```
 1         not going to answer.
 2    A    Correct.
 3    Q    And you have no expertise to answer them?
 4    A    Correct.
 5    Q    Okay.  And this is a -- maybe a repetitive
 6         question, you can't give me an opinion as to
 7         what is causing either Mr. Killian or Ms.
 8         Banes' pain in any part of their anatomy,
 9         correct?
10    A    Correct.  Biomechanics does not answer that
11         question.
12    Q    You have on the next page, page 16, that "Both
13         Ms. Banes and Mr. Killian stated they have
14         experienced injuries to their right shoulders
15         while the vehicle swung sideways."  And you
16         have "Their description of sway is not
17         consistent with the nature of the accident."
18    A    Yes.
19    Q    Okay.  But I think we covered this earlier, if
20         they did get pushed laterally toward the side
21         15 feet as they testified, then that would be a
22         mechanism that could produce injury.
23    A    It could produce contact to the left shoulder.
24         Because if it's occurring like that, it's
25         occurring towards the right, which would move
```

```
 1        them inside the vehicle towards the left.
 2   Q    How about when they returned -- the return
 3        motion when they swing back?  If it moves left,
 4        they got to go back right to get there, would
 5        they hit the right shoulder, as well?
 6   A    No, sir.  There's no elastic structure that
 7        forces them in the other direction.  That's in
 8        analog to the question of rear end versus
 9        sideswipe or lateral impacts.
10   Q    And you have "During the first phase swing to
11        the left," and I think you're talking about
12        what you actually identified in this accident,
13        "Mr. Killian's left shoulder could have made
14        slight contact with the door, the B-pillar,"
15        correct?
16   A    Yes.
17   Q    You have on page 17 in the middle of your page
18        there, it says, "The science of injury
19        biomechanics is fundamentally different from
20        that of medicine."   I think we covered that.
21        "It does not offer diagnosis, treatment, or
22        prognoses but instead addresses the
23        relationships between events and damage to
24        tissue by studying physics of accidental
25        events, the properties of tissue, and the
```

```
 1        application of loads to tissue in accidental

 2        events."  My question to you is this, in doing

 3        so, people's body makeup is different, would

 4        you agree?

 5   A    In part.  People's makeup is not different,

 6        tolerances may be different.  So when we are --

 7        so when we are addressing things in terms of

 8        tolerance, then sure.  But the opinions that

 9        are contained here are not discussing

10        tolerances, they're discussing basic mechanism.

11        And even if the amount of forces that will

12        induce this, or that type of injury, may be

13        different from person to person.  In basic

14        mechanism that induces those same injuries,

15        it's the same.

16   Q    I was watching the National Championship last

17        night.  Back in the day I played football and I

18        could have run and hit with those guys back in

19        the day, but if I did that today, they'd have

20        to come pick me up with an ambulance.  My point

21        is, as a person gets older, as a person gets

22        heavier, as a person has illnesses, as a person

23        has different things, are their tolerances for

24        injury to a specific area different?

25   A    Tolerances, yes.  Fundamental mechanisms, no.
```

```
 1        So the tolerances --
 2    Q   From the mental mechanisms?
 3    A   Fundamental mechanisms.
 4    Q   Oh, fundamental, I'm sorry.  So you're looking
 5        at statistical data based on hundreds of people
 6        or thousands of people in these studies?
 7    A   Yes.  And different types of studies.
 8    Q   Okay.  In these studies you look at, is a
 9        person's age, does a person's age make them
10        more susceptible to the effects of trauma?
11    A   The answer is, again, to the -- when you say
12        "more susceptible," you mean the tolerances
13        will change.  So let's say we apply a
14        compression load, grandma will have a much
15        lower compression load to fracture than
16        linebacker.  Those two numbers, numbers would
17        be different, but if you compress grandma's
18        spine, you'll get a compression fracture.  And
19        if you compress linebacker's spine, you'll get
20        a compression factor.  Just at very different
21        numbers.  So the tolerances are very different,
22        the mechanisms are not.
23    Q   Well, the pushing on the spine is the
24        mechanism, it's the same. But what my question
25        is, grandma's spine's going to burst a lot
```

```
 1        quicker than linebacker's spine.  If they're
 2        sitting side by side and you're pushing them
 3        down the exact same way.
 4   A    Absolutely.
 5   Q    That's my point.  The anatomy of each
 6        individual person is different.
 7   A    Yes.  Now, where that analogy goes differently
 8        than you and I might think, let's say if you a
 9        compression, then grandma will be much weaker
10        than mister linebacker.  But let's say if we
11        put a mechanism that will tend to do a disc
12        injury, which would be flexion and compression,
13        then it might go the other way.  Because
14        grandma may end up with a fracture before
15        mister linebacker, whereas he will have a disc
16        injury. So the mechanisms will be the same, but
17        at some point, some things become stronger than
18        others.  So tolerances only gets us so far.
19   Q    Okay.  So in certain accidents that both of us
20        attorneys have handled over our careers, there
21        are certain people that get killed in an
22        accident and certain people that walk away.
23   A    Sure.
24   Q    Is that a tolerance issue or is that a
25        mechanism -- they're both in the same car
```

```
 1        wreck, they're both in the same vehicle with
 2        the same delta-V, with the same everything, why
 3        does one person snap their neck and die, and
 4        the next person doesn't have a scratch on them?
 5   A    There are questions of tolerances, and there is
 6        no denying the fact that there can be other
 7        elements that we can't assess.  And that is the
 8        element of luck.  And I've come across exactly
 9        what you're saying.  The vehicle that had a
10        frontal accident at 35 mile an hour delta-V,
11        rear ender at 71 mile an hour delta-V and he
12        had a mild traumatic brain injury and a humerus
13        fracture, that was all.  He's not walk -- he
14        didn't walk away, but that's close to walking
15        away from something that -- on either of those
16        two hits could have been fatal.
17   Q    I'm getting close to being done, let me check
18        my notes.  So what we know from talking
19        already, I'm just going to surmise this, there
20        was no complete accident reconstruction done,
21        correct?
22   A    Correct.
23   Q    We don't know the weight of the trailer or the
24        stuff on the trailer, the ATV or the lawnmower.
25   A    Correct. Simulations were done -- that was
```

1      addressed by doing a range from minimum to

2      maximum.

3  Q   You didn't inspect either truck.

4  A   Correct.

5  Q   You didn't inspect either truck for damage or

6      damage that was not repaired.

7  A   Correct.

8  Q   You did not download any of the data from any

9      vehicle.

10  A   Correct.

11  Q   You have no skid data.

12  A   Correct.

13  Q   You did not measure the scene of the accident.

14  A   Correct.

15  Q   And you did not go to the scene of the

16      accident.

17  A   Well, again, once the vehicles are gone, the

18      scene becomes a site, so we did not go to the

19      site of the accident.

20  Q   You did not go to the site of the accident.

21  A   Correct.

22  Q   You did not test what it would take to deform

23      the metal on the trailer itself.

24  A   Correct.

25  Q   You did not test what it would take the break

| | | |
|---|---|---|
| 1 | | the axle on the trailer. |
| 2 | A | Correct. |
| 3 | Q | You did not test what force it would take to |
| 4 | | break the bolts on the leaf springs of the |
| 5 | | truck. |
| 6 | A | Correct. |
| 7 | Q | And you did not test what forces it would take |
| 8 | | to bend the receiver hitch. |
| 9 | A | Correct.  Again, I did not test specifically to |
| 10 | | this case.  Let's clarify that. |
| 11 | Q | And you cannot give us an opinion on medical |
| 12 | | causation as to Ms. Banes or Mr. Killian, |
| 13 | | correct? |
| 14 | A | That's absolutely correct. |
| 15 | Q | And as to the both vehicles, you do not know |
| 16 | | whether or not the air bags deployed, correct? |
| 17 | A | May I see that police report, please?  In the |
| 18 | | Anderson vehicle, the air bags did not deploy, |
| 19 | | per the accident report.  In the Killian |
| 20 | | vehicle, the air bags did not deploy, per the |
| 21 | | accident report. |
| 22 | Q | Okay, per the accident report.  You don't know |
| 23 | | because you didn't inspect the vehicles, |
| 24 | | correct? |
| 25 | A | I don't have personal knowledge other than |

```
 1        reading the accident report.
 2   Q    Okay, thank you, sir.
 3            MR. CAUBARREAUX:
 4                Okay, I think that's all I have.  Thank
 5            you.
 6            MR. LAVELLE:
 7                I have no questions.
 8                    -- OFF THE RECORD --
 9            MR. CAUBARREAUX:
10                Sir, you have the right to read and
11            sign your deposition or you can waive that
12            right.  But I need you to elect one or the
13            other.
14            THE WITNESS:
15                I will read and sign.
16            MR. CAUBARREAUX:
17                Let me ask one other question.
18   MR. CAUBARREAUX:
19   Q    I got this list, is this the complete list of
20        all of your testimony?
21   A    Very much so, yes, sir.
22   Q    Okay, I didn't go -- I went through the last
23        seven years of this list.  I didn't go through
24        all of it because it's from '05, I think.  Does
25        that sound correct?
```

```
 1  A     Yes.
 2  Q     In the last seven years, it appears that you
 3        worked for plaintiffs and defendants.
 4  A     Yes.
 5  Q     You worked for plaintiffs 10 times and
 6        defendants 256 times, 96.1 percent.  Does that
 7        sound about right?
 8  A     That sounds about right.
 9            MR. CAUBARREAUX:
10                Okay, thank you sir.  That's all I
11            have.
12  THE WITNESS WAS EXCUSED.
13  DEPOSITION CONCLUDED AT 2:38 p.m.
14            COURT REPORTER:
15                Did you need a copy of his deposition?
16            MR. LAVELLE:
17                Yes, uh-huh.
18
19
20
21
22
23
24
25
```

REPORTER'S PAGE

I, Cynthia M. Hare, Certified Court Reporter, in and for the State of Louisiana, the officer, as defined in Rule 28 of the Federal Rules of Civil Procedure and/or Article 1434 (b) of the Louisiana Code of Civil Procedure, before whom this sworn testimony was taken, do hereby state on the Record:

That due to the interaction in the spontaneous discourse of this proceeding, dashes (--) have been used to indicate pauses, changes in thought, and/or talkovers; that same is the proper method for a Court Reporter's transcription of a proceeding, and that the dashes (--) do not indicate that words or phrases have been left out of this transcript;

That any words and/or names which could not be verified through reference material have been denoted with the phrase "(spelled phonetically)."

Cynthia M. Hare, CCR
Certified Court Reporter
Louisiana License #2010007

```
 1                    CERTIFICATE
 2        This certification is valid only for a
 3   transcript accompanied by my original signature and
 4   original required seal on this certificate.
 5        I, CYNTHIA M. HARE, Certified Court Reporter in
 6   and for the State of Louisiana, as the officer
 7   before whom this testimony was taken, do hereby
 8   certify that DR. RICHARD BARATTA, PH.D., P.E., after
 9   having been duly sworn by me upon authority of R.S.
10   37:2554, did testify on the 12th day of January
11   2021, at Metairie, Louisiana, as hereinbefore set
12   forth in the foregoing 81 pages; that this testimony
13   was reported by me in the Voicewriting reporting
14   method, was prepared and transcribed by me or under
15   my personal direction and supervision, and is true
16   and correct to the best of my ability and
17   understanding; that the transcript has been prepared
18   in compliance with the transcript format guidelines
19   required by statute and rules of the board; that I
20   am informed about the complete arrangement,
21   financial or otherwise, with the person or entity
22   making arrangements for deposition services; that I
23   have acted in compliance with the prohibition on
24   contractual relationships, as defined by Louisiana
25   Code of Civil Procedure Article 1434 and rules of
```

1  the board; that I have no actual knowledge of any

2  prohibited employment or contractual relationship,

3  direct or indirect, between a court reporting firm

4  and any party litigant in this matter, nor is there

5  any such relationship between myself and a party

6  litigant in this matter; that I am not related to

7  counsel or to any of the parties hereto, I am in no

8  manner associated with counsel for any of the

9  interested parties to this litigation, and I am in

10  no way concerned with the outcome thereof.

11      This 15th day of January 2021, Metairie,

12  Louisiana.

13

14

15

16

17                        Cynthia M. Hare, CCR
                         Certified Court Reporter
18                        Louisiana License #2010007

19

20

21

22

23

24

25

**Exhibits**

**Rimkus Consulting Exhibit 01** 4:9 7:17 8:5
**Rimkus Consulting Exhibit 02** 4:10 8:24 9:9

**$**

**$445.00** 25:17

**0**

**05** 79:24

**1**

**1** 7:17 8:5 15:16
**1.2** 63:22
**1.2g's** 15:14
**1.4** 63:24
**10** 20:22 80:5
**10/12** 20:19
**11** 55:20
**12** 20:22
**13** 64:6,25
**14** 67:10
**15** 41:11 43:12 44:4 52:8
  54:13 58:12 68:22
  71:21
**150** 17:2
**16** 71:12
**165** 23:16,21,24 24:9
**167** 23:16,21
**17** 72:17
**18** 26:8
**18-wheeler** 66:9,10
**1984** 5:20
**1986** 5:22
**1989** 5:24
**1g** 15:14

**2**

**2** 8:24 9:9 32:16 63:24
**2,000** 15:18 60:10
**20** 19:11 20:17 56:4
**2020** 9:2
**250** 18:7
**256** 80:6
**2:38** 80:13
**2g'** 15:16

**3**

**30** 9:2 48:9

**35** 76:10

**4**

**4,000** 20:16
**4,500** 15:18
**40** 18:11 48:7,10
**45** 48:4
**4500** 20:16 60:11

**5**

**5** 52:6
**500** 5:12 60:8

**6**

**60** 67:13

**7**

**7** 11:11
**71** 76:11

**8**

**8** 5:11 63:21,22

**9**

**90** 34:7
**96.1** 80:6

**A**

**ability** 32:25
**absolutely** 37:23 75:4
  78:14
**accelerating** 36:1,6
  64:14 65:2
**acceleration** 15:15
  37:25 38:5 63:12 66:18
  67:17,22,23,24 68:1,2,3
**accelerations** 15:13
  17:8 39:12,20 41:7
  67:11
**accident** 6:8,9,11,22,23
  9:15,17,21 12:19,23
  13:2 14:8,21 15:20
  17:20,23 18:12,14 21:9,
  16,18,20 22:2,8,25
  23:16 24:2 25:10 36:12
  38:8 39:16 40:8,9,10
  41:5,18 42:9,22,24
  43:3,9 44:7,14 45:3
  46:8,12,17 47:25 48:6
  52:10,13,20 53:1,14,19
  55:19 56:17,19 58:19

59:14,15 64:1,14,15
  65:9 66:23 67:17 69:25
  70:2,4,5,6,7,15,21
  71:17 72:12 75:22
  76:10,20 77:13,16,19,
  20 78:19,21,22 79:1
**accidental** 72:24 73:1
**accidents** 59:5 75:19
**account** 12:13 45:7
**accurately** 35:9
**ACM** 16:15
**activities** 39:14
**actual** 32:20,21 47:18
  48:25 53:19,21 55:25
  56:13
**address** 5:8,10
**addressed** 77:1
**addresses** 72:22
**addressing** 73:7
**advanced** 46:5
**affect** 60:15 62:25
**affects** 62:16 63:3,5,6
**aformation** 42:5
**age** 45:8,15 74:9
**age-related** 45:16
**aging** 45:21,22
**agree** 35:6 73:4
**air** 14:7,10 16:23 49:3
  78:16,18,20
**ambulance** 73:20
**amount** 73:11
**analog** 72:8
**analogs** 10:6,8
**analogy** 38:3 65:17 75:7
**analyses** 17:7
**analysis** 15:8 17:16,23
  18:1 19:7 21:24,25
  22:1,7,11,15,24 23:7,12
  25:23 30:16 47:6,12
  53:15 54:19 55:10
  56:16,17,24 64:22 65:7,
  11,14
**analyze** 20:1
**anatomy** 71:8 75:5
**Anderson** 78:18
**angle** 34:9,11,12,15
  49:25 68:20
**answers** 23:3 42:2
**appears** 8:21 24:17 80:2
**applicable** 66:22
**application** 6:3 73:1
**applies** 55:21
**apply** 74:13
**approach** 55:21
**archived** 26:24
**area** 73:24

**areas** 6:7
**argue** 32:5
**arguing** 32:5 47:1
**argumentative** 22:22
  49:10
**arise** 6:4
**articles** 28:15
**asphalt** 11:5,21 12:2
**assess** 76:7
**assist** 59:14
**assume** 12:16 17:5,7
  36:6 43:2
**assumed** 12:15
**assumes** 70:10
**assuming** 16:13 17:4
**assumption** 61:2
**at-fault** 23:7 56:17
**attach** 7:16
**attachments** 8:21 40:5
**attempt** 9:16 24:24
**attempted** 25:1
**attempting** 23:23 24:12,
  19 34:13 35:18
**attorney** 13:21 29:15
**attorney's** 13:20
**attorneys** 75:20
**ATV** 15:22 16:6 76:24
**autostats** 27:16
**average** 69:22
**avoid** 24:24
**aware** 62:3
**axis** 10:11
**axle** 47:8 50:16 51:14
  52:19 58:13 78:1
**axle's** 66:5
**axles** 58:20,22

**B**

**B-PILLAR** 72:14
**bachelor's** 5:18
**back** 33:4,7,8,16,19
  34:10 35:3,14 36:16
  57:5,10 58:2,3 63:8
  67:21 70:13 72:3,4
  73:17,18
**background** 5:17
**backwards** 36:13
**bad** 60:18
**bag** 16:23 49:3
**bags** 14:7,10 78:16,18,
  20
**Banes** 5:6 28:12,18,23
  46:7,14,15 53:10 71:13
  78:12
**Banes'** 28:11 71:8

**Baratta** 5:1,9
**barely** 50:23
**base** 42:10
**based** 14:16 26:3 52:15
  74:5
**basic** 73:10,13
**basically** 11:9 30:4 39:5
**basis** 18:8 26:7 32:4
  54:18
**beginning** 55:5
**behalf** 28:1
**belief** 42:5
**bend** 47:13,15 48:13
  51:21 78:8
**bent** 52:19
**big** 39:6
**biology** 6:5
**biomechanical** 56:23
**biomechanics** 6:8 44:23
  71:10 72:19
**biomedical** 5:19,21,23,
  25 6:2
**bit** 23:14 34:8 55:11
**blew** 24:4
**body** 22:14 35:10 44:16
  51:5 73:3
**bolts** 51:9 53:1 78:4
**bone** 37:19
**bottom** 7:12 22:25 52:6
  55:20
**box** 29:12
**brain** 76:12
**brake** 64:9
**braking** 35:21,23 64:8,
  10,11,13 65:2
**break** 47:7 48:12 51:8
  53:1 67:3,8 77:25 78:4
**brevity** 62:23
**Brian** 5:5
**broken** 52:18
**building** 54:18
**built** 11:10
**bulge** 69:5,16,24 70:6
**bulging** 68:23 69:4,12,
  23 70:5
**bumper** 50:20,22,23
**bunch** 28:14 61:5
**burst** 74:25

**C**

**calculated** 20:6
**calculating** 45:14
**calculation** 20:14
**calculations** 20:7 21:2,4
  30:12 52:15 62:1,15
  64:13

call 55:4 65:22
called 6:21 9:14 10:9
calm 49:11
car 10:13 22:14 69:25 75:25
careers 75:20
case 6:6,25 8:19 12:14 25:18 29:16 46:20 68:7 78:10
Caubarreaux 5:4,5 7:4, 9,15,20 8:4,6,12,16 9:3, 8,10 17:14 18:22 19:1 21:12,17 22:18,23 31:12 40:3,6,19 42:3 49:13 54:9 66:4 67:5,9 70:18 79:3,9,16,18 80:9
causation 28:17,22 44:17,19 45:2 70:24 78:12
caused 6:11,23 21:9,16, 20 46:9 70:21
causing 71:7
center 36:9
cervical 55:17
cetera 30:13
chair 39:17 40:11,12,18 41:6
Championship 73:16
change 15:11,12,14 17:1 45:18 47:24 48:5 54:17 55:11,14 74:13
changed 5:10 54:14
character 37:10
check 64:16 76:17
Chevrolet 13:25 14:6 27:15 32:17 65:16
Chevy 27:17
chronic 69:12
circumstances 59:13
cite 25:7
claimed 25:12
claims 52:17,22,23
clarify 28:6 78:10
clear 34:2
cleared 18:6
clerical 64:12
client 13:20
clockwise 57:1,15,17 58:18
close 9:19 76:14,17
closer 58:2
co-moments 11:12
coefficient 11:5
coefficients 11:11
colleagues 27:21 28:1
collided 59:4

collision 33:22 37:9,14
comment 6:23
complained 38:11
complete 21:24,25 22:11,15 53:14,20 76:20 79:19
completed 64:7
compliance 48:1
component 42:25 43:8, 9,14 55:13
composite 15:25
compress 74:17,19
compression 74:14,15, 18,20 75:9,12
compressive 40:20 41:2 43:17
concerned 28:7
concluded 23:8 56:18 80:13
conclusions 32:15
concrete 11:22 12:2
condition 15:1
conducing 70:16
conducive 15:2 46:12
conduct 25:15
conjunction 68:24
connected 32:19 39:4 52:2 57:21,22 61:9 65:25 66:6
connecting 51:6
connection 29:16 32:24, 25
consideration 45:13
consistency 45:2
consistent 17:20,22 42:8 43:1,11 44:6 45:3 46:18 52:12,14 69:14 70:16 71:17
contact 32:17,20 35:5 43:24 50:1,2 56:21 71:23 72:14
contacted 32:20
contained 28:20,21 31:11 73:9
contest 23:9
context 56:16
Contextually 66:15
controlled 34:25
copy 7:16,21 8:2 9:11 24:1 27:8 29:14 30:12, 18 31:17,22 80:15
corner 18:18 49:19,24
correct 6:12 8:9 9:4,12 16:10,14 17:17 21:3 23:17,24 24:20 25:13 26:13 30:17 31:3 35:10, 11 41:1 46:24 49:15

52:4 54:11 56:1,12,15 57:22 58:23 60:3,5,21 64:4,21,25 65:3,5 66:7 68:6,10 69:25 71:2,4,9, 10 72:15 76:21,22,25 77:4,7,10,12,14,21,24 78:2,6,9,13,14,16,24 79:25
correctly 13:6
correspondence 6:13 30:13
counsel 27:10
Counter 57:3
counterclockwise 57:2, 4,10,13,24 58:21
couple 51:24
coupled 32:23 42:17 66:8
coupling 67:12
COURT 80:14
cover 6:14,15 9:4
covered 71:19 72:20
crash 26:10
created 33:24
crossing 19:25
crush 48:17,23 50:18 51:1
current 10:18
cycles 18:7,11

**D**

daily 39:14
damage 9:24 13:15,17, 18 14:1,2,3 48:15 49:22 50:11,16,25 51:5 53:22 56:13 72:23 77:5,6
damaged 34:1
damages 45:5,25 46:19
damped 67:11
data 16:13,15 17:6,15,21 18:2,3,13 19:6 27:17 50:5 56:7,9 59:18,22 60:20 61:18,25 62:12 65:2 74:5 77:8,11
database 59:19
databases 50:15,17
date 9:5
day 18:11 46:6 73:17,19
days 18:11
dealing 11:21,23
defendant 19:10 56:4
defendants 80:3,6
defense 31:16
defer 70:19
deflect 47:14

deform 77:22
degeneration 46:3,4
degenerative 68:24 69:8,12
degree 5:18,21 33:12 34:8 46:2,3
delta-v 19:20,23 38:22 65:7,11,14,15 66:20,22 76:2,10,11
delta-v's 20:10,12
demolished 66:1
denying 66:3
depend 54:25
depending 15:17 54:5
depends 20:2 54:24
deploy 49:3 78:18,20
deployed 14:7,10,15 78:16
deployment 16:23
deposing 6:25
deposition 6:17 25:25 26:1,15 28:10,12 29:4 61:21 62:22 79:11 80:13,15
depth 50:22,23
description 71:16
desiccation 69:1,9
destroyed 49:4
determination 31:19 56:18
determine 9:15,16 10:14 11:2 22:12 25:10 47:18 48:25 51:7 53:21 54:22 55:22 56:22
determining 11:25 50:12
diagnosed 46:13
diagnosis 45:6 72:21
diagram 24:2 41:5 55:3
die 76:3
difference 12:4,5 15:7 55:10 64:18
differences 12:2
differently 75:7
dimension 63:17,18
dimensional 77:16
dimensions 10:2 50:20
direct 32:17 34:7 51:14
directed 34:16
direction 34:20 42:13 58:7,9 63:6,23,25 72:7
directly 52:3
dirt 11:6
disc 45:25 68:23,25 69:4,12,16,22,24 70:4,6 75:11,15

discovery 29:25 30:8 31:11
discreet 69:6
discs 46:1,9
discuss 45:15
discussed 44:3
discussing 73:9,10
dislocation 69:6
distance 42:15
distribution 20:2
doctor 44:9,10
doctors 70:20
documents 26:18,21 27:1 29:14
Dollars 25:16
door 72:14
download 16:13,14,16, 18 17:6,15 56:7,9 59:18 77:8
downloaded 17:21 50:5
downstairs 67:4
drive 6:16 21:4 25:20 26:14 27:6 29:3 31:23 59:16 61:11,19 62:2,6 64:23
driven 13:7,19 24:18
driver 23:8 24:25 56:4
driver's 19:10 44:2
driving 66:10
dry 12:6,15
due 39:13 42:23
duly 5:2
dumb 22:6,19,20
duration 37:11
dynamic 33:1 41:7
dynamics 9:20 17:18 25:9 38:24 42:8 44:3,7 47:25 48:5 55:22 59:14 60:15

**E**

earlier 27:22 61:17 71:19
easiest 32:2
east 54:21
easy 10:21,22
ECM 16:13
educational 5:17
effect 63:16,17
effects 69:8 74:10
efficiently 34:20
effort 64:10
elastic 72:6
elect 79:12
electronic 60:19

electronically 8:1
element 76:8
elements 76:7
encompass 6:1
encompassed 6:16
encompasses 8:18
end 8:21 57:5 67:19,20
72:8 75:14
ender 76:11
energy 38:9
engaged 18:14
engineer 5:21 47:3
engineering 5:19,24,25
6:3,4
entered 24:12
entire 15:25
entirety 8:18 36:5
equate 37:15,16
equivalent 40:9 41:6
error 64:12
essentially 17:8
estimates 14:1
estimating 53:24
evaluation 41:18
event 17:16,18,19,22
18:4 19:14,22 52:16
events 72:23,25 73:2
evidence 14:12,13 54:7
55:21 70:11
exact 15:6 19:19 75:3
EXAMINATION 5:4
examined 5:2
exchange 32:1
excluding 11:14
excuse 14:19 16:24
17:12 46:14 63:4 66:25
EXCUSED 80:12
exhibit 7:17 8:5,24 9:9
39:24
exhibited 20:23
exist 19:8 56:10
exists 6:20
exit 23:20
expect 18:12 62:13
64:24
expectation 16:22 18:4,
15 45:23 56:10 69:22
experience 36:25 39:13
experienced 39:11
71:14
expert 8:8 22:13
expertise 71:3
explain 65:18
exposure 69:12
express 6:18

extent 13:15,18

**F**

fact 76:6
factor 11:16 54:16 74:20
factors 11:7,8 54:5,25
facts 55:23 70:10
fair 9:18 44:12 65:3
fairly 9:19 63:20
fatal 76:16
fault 9:15 23:9
feel 46:21
feet 41:11 43:12 44:4
52:8 54:13 58:12 71:21
fenders 47:13
figure 39:24
figures 9:13
files 26:25
finally 5:23
find 31:17 36:2,4
finding 55:23
fine 27:13 67:6
finish 17:12 42:1
finishing 6:2
five-minute 67:3
fixed 57:18,19
flawed 17:23
flexion 75:12
follow 59:21
foot 64:8,9
football 73:17
force 20:23 34:16,23
43:4,14 47:7 48:12,14
50:16 51:8,20 53:5,6,7
78:3
forceful 64:10
forces 9:16,19 15:19
33:11,14,22,24 34:4,18,
21 36:11 38:10 44:13
45:14 46:16,18 48:24
49:1 50:10 52:25 56:22
62:18 63:14 72:7 73:11
78:7
Ford 13:7 15:13,15
16:12,15,20,21 17:4
27:17 32:18,21,23 33:1,
3,5,6,9 34:24 36:22
39:10 43:5 51:4,7 52:3,
16 60:4 64:1,11,13,15
65:8,10
Ford's 25:11
fore 42:25 63:8
form 21:11 22:17 41:22
44:22 54:2 66:3 70:9
formation 69:1

formulate 29:18 31:14,
15
formulating 62:4
Forty-five 25:16
forward 31:24 42:23
67:22 68:7,15
found 11:22
fracture 69:5 74:15,18
75:14 76:13
frail 45:18
frame 52:3
friction 11:4,10,15,19
12:12
front 9:11 20:14 33:16
34:10 35:1,14 36:17
49:18,23 50:19 51:1
52:19 58:3
frontal 68:1 76:10
full 5:7,9 13:18 41:17
fundamental 73:25 74:3,
4
fundamentally 67:18
72:19
furnished 29:25
future 28:4 29:13

**G**

g's 63:22,24
garner 22:8
gather 9:22,23,25 10:1
gave 6:16 21:5 26:15
29:3 30:3 59:16
general 45:21 50:20
generally 10:15 29:24
31:10 42:12 57:19 69:4,
7
generate 8:8
generated 8:19 30:5,10,
11
germane 50:14
give 6:7,10,22 44:13,17,
19 58:17 65:10,14 71:6
78:11
giving 22:12
globo 9:9
GM 16:15 19:20 20:24
GMC 13:13,16,19 16:12
18:2,3,5,23 19:14,23
23:9 24:7 32:21 33:4
34:3,12 35:3,15 36:8
47:19 48:3,18,22 49:2,
15,16,23,24 50:4,5,6,
19,25 51:2 53:24 59:3
60:1,24 61:8 68:8
good 47:17 48:11 50:15,
17 67:7

Google 12:25
gouge 56:1
grandma 74:14 75:9,14
grandma's 74:17,25
grass 54:20
greater 12:8,9 67:22,23
68:2 69:21
Greenway 5:11
guess 22:6 24:1,14 25:8
44:20 57:6
guy 66:9
guys 73:18

**H**

half 15:16
handled 75:20
happen 37:24 41:16
58:15 59:5,8 62:10
68:18
happened 22:12,25
23:2,16 58:10
happening 35:18
happy 29:7 61:15
hard 11:13
head 41:8
health 65:8
heavier 63:14,16 73:22
height 45:13
Highway 23:16
hired 13:21 25:13
hit 19:11 20:16 35:15
42:12 48:3 53:24 57:16
58:2 62:24 65:19,20
66:12 72:5 73:18
hitch 32:24 36:25 38:2
51:21 52:2,5 57:20 78:8
hits 20:19 34:14 36:9,18
68:8 76:16
hitting 24:24 34:3 37:14
42:12 48:7
Hold 49:7
hour 17:2 19:12 20:17,
19,23 25:17 48:4,7,9
56:5 76:10,11
Houston 5:15,16
humerus 76:12
Hundred 25:16
hundreds 74:5
hung 59:3,5
hurt 46:7,22 55:15,16

**I**

ice 11:6
idea 66:21

identified 22:5 72:12
ignition 18:7,10
illnesses 73:22
immediately 54:6 56:20
impact 25:4 33:24 34:8
35:17 42:16,18 48:15
51:16 57:8,23 58:13,19
65:13 66:20 67:20
impacted 35:15
impacts 51:14 72:9
important 11:20 19:7
impossible 41:20 52:11
59:8,9
incident 55:23
include 47:25
including 28:14 68:25
incorrect 24:16
increase 45:24 48:1
indentation 49:18
independent 11:18
21:15,21,22 23:6
indication 14:8
individual 28:3 42:6
75:6
individuals 45:19
induce 73:12
induces 73:14
industry 69:15
inertia 10:9,20,22 11:19
inertial 10:2,4 12:10
39:20
influence 54:24
influential 55:1
information 7:2,7 8:19
9:22,24 10:1,16 19:4
22:8 25:22 26:4,6,7,8
27:4 30:15 47:17 50:6,
9,13,15 59:20 62:6
injure 44:15
injured 46:15
injuries 25:12 38:11,21,
23 43:6,10,15,16,22,24
45:19,25 46:13 55:16
71:14 73:14
injury 39:3,8 43:5,14,21
44:14 46:10 71:22
72:18 73:12,24 75:12,
16 76:12
input 60:20
inside 38:18,19 72:1
inspect 12:18 13:1,7,11,
13 16:11,12 27:24,25
48:19,20,22 56:8 77:3,5
78:23
inspected 14:20 27:18,
23 28:1 48:20

inspection 30:11 51:10
inspections 13:3
interaction 19:18
interrogatories 30:25
intersection 24:12
intersectional 37:13
invoice 25:15,17
involve 10:6
involved 13:2 14:21
   59:11
issue 65:21 75:24

J

James 27:18
Jim 47:5
jump 21:4 25:20 26:14
   27:5 29:3 31:23 59:16
   61:11,19 62:2,6 64:23

K

keeping 14:24
killed 75:21
Killian 5:6 13:8 23:19,20
   24:15,25 28:11,18,23
   35:20 36:6 41:10 46:7,
   15 52:17 58:11 68:23
   70:3,20 71:7,13 78:12,
   19
Killian's 28:9 52:7 69:14
   72:13
kind 39:17 48:15 51:15,
   20 67:16
kinetics 22:9 23:5
knew 36:2
knowledge 78:25

L

lack 34:18
laid 12:24
lateral 33:11,13 34:21,
   23 40:22 41:3 43:8,9,18
   55:13 58:7,9 63:3,5,17,
   23 67:25 72:9
laterally 44:4 68:12
   71:20
Lavelle 7:1,6,18,23 8:14,
   25 9:6 17:11 18:20
   21:10 22:16,21 29:9
   30:21 31:4 40:1,13
   41:21 49:6 54:1 66:2
   70:8 79:6 80:16
lawnmower 76:24
lawyer 31:16
leaf 51:6,9 52:18 53:2
   78:4

left 23:23 24:13 38:18
   43:24 44:2 49:18 68:16
   71:23 72:1,3,11,13
left-hand 55:5
length 53:16,17
lesser 39:7
letter 9:4
letters 28:17,22
level 42:10
levels 39:13
lifting 69:14
light 33:4
lighter 62:23,24 63:2,4,7
likewise 19:6
limited 32:25 34:25
   56:19
linebacker 74:16 75:10,
   15
linebacker's 74:19 75:1
link 31:25
list 28:14 30:2 79:19,23
listed 26:9 32:3
literature 18:9
lived 37:25
living 39:14
load 40:20 74:14,15
loading 69:13
loads 39:20 40:22 43:18,
   19 45:14 67:21 73:1
location 15:1
long 57:22
longitudinal 15:15
   33:11,13,21 34:20
   40:22 41:3 42:14 55:12
   63:6,18,23,24
looked 21:8 27:14,21,22
   28:9,10 31:13,15,18
   32:6 47:3 51:14 53:21
lot 8:23 53:23 74:25
low 51:17
lower 12:11,12 74:15
luck 76:8
lying 41:20 42:19

M

made 16:17 32:21 38:3
   72:13
magnitude 39:19
make 10:21 12:5 14:5
   15:7 31:18 45:17 55:10
   57:9,17 58:8 64:18 74:9
makes 12:3
makeup 73:3,5
maps 12:25
mark 8:24

marks 54:10,12,15
   55:25 56:1
mass 67:12
master's 7:25
material 7:25
materials 27:3 28:13
   29:1,5,24 30:4,10,14
   31:9 32:3
mathematical 59:12
mathematics 5:20
matter 57:25
maximum 77:2
meaning 55:25
meaningful 12:3,5 15:9
   16:25 17:1 37:7,20
   38:5,14,15,20,23 39:3
   43:8,9,13,17 47:22,23
   55:18,19
meaningfully 17:25
means 16:1 28:2,7 30:9
   32:7 52:24
measure 77:13
measured 53:16,17
measurements 53:15
mechanics 45:3,4 46:11
   52:13 70:15
mechanism 43:4 69:11
   71:22 73:10,14 74:24
   75:11,25
mechanisms 25:11 43:7
   70:1 73:25 74:2,3,22
   75:16
median 54:20 55:9
medical 28:10,12,21
   29:2,17,22 32:6,7,9,10,
   11 44:9,10,17,19,21
   46:22,23 70:19,24
   78:11
medically 70:21
medicine 6:4 72:20
mental 74:2
mention 66:21
mentioned 37:24
metal 48:13 77:23
middle 35:12 57:9 72:17
mild 76:12
mile 76:10,11
miles 17:2 19:11 20:17,
   19,22 48:4,7,9 56:4
milliseconds 17:2
mind 67:3
minimal 49:18
minimum 77:1
minor 39:11 46:3 51:5
minute 36:4 49:7
misspoke 57:12

mister 75:10,15
models 19:20
modest 63:21
moment 10:22 25:1
moments 10:9,20 11:19
months 5:11
moreso 35:12
motion 33:1,5 35:1 37:1,
   20,21 38:6,20 39:2,3
   66:16,17 68:18 72:3
motions 23:5 25:10 37:8
   38:8,14,19 39:6,11
   56:22
move 35:4 58:6,9 66:19
   68:4,7,12,20 71:25
moved 5:13 15:4 42:15
movement 64:4
movements 22:10
moves 67:21 72:3
moving 22:14 38:2 44:3
mower 16:3
MRI 70:3
mud 11:6

N

narrowing 68:25 69:9
National 73:16
nature 65:12,13 71:17
necessarily 46:1,18
   50:14
neck 41:8 76:3
net 37:20,21 38:5 66:16,
   17
neurosurgeon 28:19,24
night 73:17
non-complete 22:7
non-contact 16:21
   52:16 65:11,24 66:6,7,
   13
normal 64:10
northbound 23:22
northwards 23:21
notes 76:18
Noteworthy 68:21,22
number 16:20 24:6,18,
   19 39:9,25 40:4 44:5,
   21,22 45:12,15 51:11,
   13 54:5,25 55:3 60:6
numbers 19:21 60:8,9,
   17,20 74:16,21

O

oath 41:15
object 21:11 22:17
   41:22 49:7,9 54:2 66:3

70:9
obtained 7:7
obvious 49:25
occupant 22:10 37:8
   38:9,18 68:3
occupant's 67:12
occupants 9:17 23:6
   25:11 38:15 39:9,10,21
   62:17 64:1 67:11
occupation 69:15,21
occupational 69:13
occur 70:7
occurred 12:23 25:5
   69:24
occurring 71:24,25
October 9:2
offer 72:21
office 5:13,15
officer 22:5 23:7,8
officer's 26:1
older 18:5 19:20 73:21
one's 33:18
opinion 6:11 21:9,15,19,
   21,23 22:13 29:19
   31:14 35:2 44:13,17,20,
   22 53:1 54:14 62:4 71:6
   78:11
opinions 6:7 26:3 54:16,
   18 73:8
opportunity 61:25
opposed 10:23 45:19
opposite 68:9
order 17:2 55:22 56:21
   58:14
original 7:22,24
orthopedic 28:19,24
osteophyte 69:1
osteophytes 69:9

P

P.E. 5:1
p.m. 80:13
pain 71:8
painted 39:24
paragraph 64:6
parameter 6:14
parameters 6:14
parked 18:17 20:22 33:3
part 8:7 29:25 30:7
   31:10 62:8 63:12 71:8
   73:5
parties 26:22
pathology 70:17
Paul 8:13
PDF 62:20

**peak** 67:23 68:3

**people** 15:19 39:22 42:20 74:5,6 75:21,22

**people's** 73:3,5

**percent** 67:13 80:6

**perceptions** 42:21

**performed** 13:3 59:14 61:18

**person** 13:20 43:5 45:8, 9,18 46:20 67:21 73:13, 21,22 75:6 76:3,4

**person's** 40:23 45:15 74:9

**personal** 78:25

**personally** 27:25

**Ph.d.** 5:1,23

**phase** 72:10

**photograph** 13:25 14:18 27:14 49:17,20 55:3 56:14 58:25

**photographs** 13:5,17, 23,24 14:17 26:11,16, 19,20 27:15 29:21 30:11 35:6 40:5 59:2

**physical** 13:3 32:20 45:8

**physically** 12:21 13:1,9 49:16 53:20

**physicians** 45:6 46:23 47:1

**physics** 59:11 72:24

**pick** 73:20

**pickup** 51:21 53:11

**picture** 39:6 49:5 50:7, 24

**pitch** 11:1

**place** 6:18 12:24 42:5 53:23

**plaintiffs** 5:6 80:3,5

**played** 73:17

**Plaza** 5:11

**point** 50:2,3 56:20 57:18,19 58:8 66:17 73:20 75:5,17

**police** 25:25 31:5,8 78:17

**policeman's** 25:25

**position** 35:9

**positions** 55:24

**possibility** 45:1

**Possibly** 53:3,4

**post-** 42:17

**potential** 12:9 37:7 38:21,23 39:7 43:19,24 45:18,23,25

**potentially** 54:17

**pounds** 15:18 20:16 51:24 60:9,11

**practice** 6:24

**pre-impact** 42:17

**preformed** 17:7

**present** 70:1

**presented** 62:12

**preserve** 62:9

**presume** 14:16

**Presumed** 12:17,18

**pretend** 44:10

**pretty** 19:25

**primarily** 42:24

**principles** 6:3

**printed** 7:25

**problem** 62:8 65:17

**proceeding** 24:9

**process** 8:7 30:1,8 31:11 40:17 45:22

**produce** 71:22,23

**produced** 9:1 26:21

**production** 26:17,21 30:24

**profession** 5:25

**professional** 5:8,10

**prognoses** 72:22

**project** 59:6

**prolapse** 69:6

**proper** 37:18 58:14

**properties** 10:3,4 12:11 72:25

**protrude** 58:22

**provide** 23:3 27:10 29:7

**provided** 25:22 27:1 29:1,6,15 30:5,6

**providing** 58:16

**published** 10:15

**pull** 36:10

**pulling** 34:5 62:25 65:18,19,20 66:13

**pulse** 38:1,5

**purely** 29:24

**purpose** 31:19 40:7 55:23

**push** 10:24 36:13 42:13 50:18 58:14,20

**pushed** 33:16,18 36:21 41:11 42:23 43:2,12 50:21 58:11 71:20

**pushing** 36:19 54:12 74:23 75:2

**put** 7:19 8:5 34:4 60:6, 23,24 75:11

**puts** 34:15 44:25

**putting** 60:13 65:24

---

**Q**

**question** 7:13 17:10 19:9 21:7,11 22:6,19,20 23:4 33:2 34:1 41:22 44:20 50:8 54:2 55:2 60:6,18,19 63:1 66:3 67:1 70:10,22,24 71:6, 11 72:8 73:2 74:24 79:17

**questions** 6:4 23:3 49:9 70:25 76:5 79:7

**quicker** 75:1

**quietly** 40:16

---

**R**

**railing** 47:14

**raising** 49:11

**ramp** 23:20

**range** 11:11 20:6,7,11, 18 39:21 40:10 77:1

**ranged** 20:9

**ranging** 15:17

**rate** 11:25 25:16

**read** 79:10,15

**reading** 22:2 79:1

**real** 37:6

**realm** 45:1

**rear** 42:25 67:19,20 72:8 76:11

**rearward** 34:16 42:13

**reason** 11:9 22:4 23:9

**reasonable** 16:22 18:3, 15 56:10

**reasons** 16:20

**recall** 13:6 28:22,25

**receive** 29:10

**received** 26:25

**receiver** 51:21 52:2,5 78:8

**reconstruction** 6:8,10, 22 9:15 22:8 41:18 53:15,20 55:20 56:19 76:20

**reconstructionist** 21:19

**reconstructions** 9:12

**record** 5:8 19:14 79:8

**recording** 16:24 17:3 18:6,16

**records** 28:10,12,21 29:3,17,22 32:6,7,9,10, 11

**recreate** 61:16

**recreation** 53:19

**red** 33:3 39:24 40:7

---

**reduced** 67:13

**reference** 28:4 29:13

**referenced** 28:13

**referring** 62:21

**reflected** 35:9 48:15

**regard** 6:9,11 16:11 22:9 28:18,23 47:2 53:23 62:15 65:1

**regular** 45:22

**regurgitate** 27:2

**regurgitated** 29:6

**related** 55:24 69:17

**relation** 25:12 67:13

**relationships** 72:23

**Relative** 56:3

**relevant** 51:3

**remains** 57:22

**remember** 5:12

**repaired** 77:6

**repairs** 14:5 27:16

**repeat** 60:12

**repetitive** 69:13 71:5

**report** 8:8,11,18,20 9:1, 11 14:8 22:2 23:14,15 24:2,11 25:8,23 26:7, 10,12 30:12 31:5,8 32:4,16 35:20 36:5 52:6 55:4 64:25 78:17,19,21, 22 79:1

**reported** 68:23 69:7

**reportedly** 51:4

**REPORTER** 80:14

**reports** 6:9

**represent** 5:5

**request** 15:3 16:16,17 19:4 30:24 51:6

**requested** 6:13

**required** 46:22 50:10

**response** 26:15

**responses** 30:24

**result** 36:19 41:1 52:19 66:20

**retain** 29:11

**retained** 25:9

**retention** 8:7

**return** 72:2

**returned** 72:2

**review** 26:6 29:2

**reviewed** 29:22 30:6 32:3

**Richard** 5:1,9

**rights** 29:11

**Rimkus** 7:14 27:18

**ripped** 66:5

**road** 12:6,7,8,12 19:24 20:22 23:19

---

**roadway** 11:4,5 12:15, 23 19:25 54:7 56:1

**roadways** 53:17 54:21

**role** 42:6 44:23

**roll** 11:1

**rotate** 10:23,25 20:25 36:25 57:17

**rotated** 57:1,7

**rotates** 58:21

**rotation** 10:7 58:17,18

**routine** 18:8 39:13

**routinely** 18:10 39:22

**run** 66:10,11 67:3 73:18

**running** 19:23

**runs** 33:4

**ruptured** 46:9

---

**S**

**scale** 24:1

**scenario** 21:8

**scenarios** 61:5 64:8

**scene** 12:19,20,22 77:13,15,18

**science** 72:18

**scientific** 55:21

**scratch** 76:4

**seat** 67:21

**seats** 67:12

**send** 27:11 31:16,23,25

**sending** 9:5

**sense** 16:17

**separate** 11:18

**series** 59:12 60:8,9

**served** 29:9

**set** 19:21

**severe** 60:16 63:13,16, 17

**severity** 51:16

**shakes** 37:18 66:19

**shaking** 37:1

**shape** 44:22

**shift** 63:7,9

**shifts** 63:7

**shop** 18:19

**short** 33:10 37:25 38:4 66:18

**shorter** 37:11

**shortly** 37:25

**shoulder** 43:23,25 44:2 46:10 55:17 68:19 71:23 72:5,13

**shoulders** 68:17 71:14

**show** 14:1 62:12

**showed** 17:8,21,24 49:18 70:4

**showing** 34:7 68:16

**shown** 13:17,22

**shows** 17:15,24 55:5

**side** 33:18,19 34:4 49:23 50:19 63:8,9 67:16 71:20 75:2

**sideswipe** 37:10,15,16, 17 38:4 39:23 40:25 67:25 72:9

**sideways** 20:19 43:2,12 52:8 54:13 58:12 71:15

**sign** 79:11,15

**significant** 37:4,6 38:10 39:2 43:4 51:25 52:25

**similar** 37:10 62:24

**simple** 19:25

**simply** 11:13 15:1 30:10 55:11 57:18 59:10 70:14,22

**simulation** 60:12,20,24 61:7 62:13

**simulations** 21:6 59:13 62:11 64:7 65:1 76:25

**single** 42:5

**sir** 5:5 7:5,10 8:10,22 12:20 13:14 14:14,23 15:5 16:17 17:7 18:1 19:3,5,13 21:6 23:18,25 24:3,5,8,10,21 25:3,6, 14,21 27:9,12,20 28:16, 25 29:5,20 30:19 32:4, 22 33:15,20,23 35:13, 16,19,22 39:15 40:21 41:8 44:8,12 46:25 47:9,11,16,20 48:14,21 49:21,25 52:5,9,21 53:6,13 55:7 57:7 59:17 61:10,20 62:9,19 64:3, 5,16 69:18 72:6 79:2, 10,21 80:10

**sit** 15:23 20:13 25:19 28:25 40:12 51:23 53:9 64:16

**site** 12:20 77:18,19,20

**sitting** 18:18 33:3 37:22 39:17 40:11,16,17 41:6 75:2

**situation** 66:15

**skid** 54:10,12,15 55:25 77:11

**slid** 52:7

**slight** 72:14

**slow** 20:24 42:14

**small** 12:3 17:8 46:2,3

**snap** 76:3

**somebody's** 22:13 42:7

**someone's** 39:1

**sort** 43:20 67:25 69:5

**sound** 79:25 80:7

**sounds** 63:1 80:8

**southbound** 23:20

**space** 68:25

**specific** 43:15 45:4 62:19 69:11 73:24

**specifically** 6:19 18:25 20:5 26:23 28:5 78:9

**speed** 17:1 47:19 50:12 53:24

**speeds** 56:3

**spin** 11:14,25 12:10

**Spinal** 44:5

**spine** 40:23 43:18 55:17 74:18,19,23 75:1

**spine's** 74:25

**spot** 59:20

**Sprader** 27:18,20 47:5,6

**sprains** 43:20 44:5 45:24

**spring** 52:18

**springs** 51:6,9 53:2,10 78:4

**spun** 57:4

**squares** 41:2

**stabilize** 46:4

**start** 6:2 30:16 34:6

**started** 38:2

**starts** 10:5 26:8 34:22, 24

**state** 5:7

**stated** 52:24 71:13

**statement** 42:7 49:8 65:3

**statistical** 74:5

**statistically** 55:16

**statistics** 69:3

**staying** 64:8

**stenosis** 69:2,10

**step** 49:12

**sticker** 7:19

**stop** 36:10

**stopped** 19:24

**straight** 24:20 55:6,8

**straightforward** 63:1

**strains** 43:20 44:5 45:24

**strictly** 9:19 23:4 31:9

**stronger** 75:17

**structural** 14:3

**structure** 72:6

**studies** 74:6,7,8

**studying** 72:24

**stuff** 16:1 39:17 61:1 76:24

**subject** 51:4 64:11

**subpoena** 27:5 29:8

**subsequent** 56:23

**Suburban** 34:3,13

**sufficient** 48:25

**Suite** 5:11

**sum** 41:2

**summaries** 32:10

**support** 56:23 58:17

**surface** 11:22

**surgeon** 28:19,24

**surmise** 76:19

**surprisingly** 51:17

**susceptible** 74:10,12

**suspension** 11:3

**sustained** 25:11 55:16

**sway** 71:16

**swing** 34:22 35:4 72:3, 10

**swings** 38:17

**sworn** 5:2

**swung** 35:2 71:15

**symptoms** 68:24

**system** 48:2


**T**

**t-** 37:18

**t-bone** 37:13,18

**takes** 16:25 48:14 50:16, 18 51:16

**talk** 15:24 44:25

**talking** 8:23 30:23 33:13 63:20 67:10 69:2,3 72:11 76:18

**technically** 66:12

**telling** 10:17,18,19 41:10,17 48:4 58:11 59:22 60:23

**tells** 18:9

**ten** 26:10,16,19,20 27:15

**tend** 38:18 45:17 75:11

**term** 34:19

**terms** 37:6 41:13 42:14 73:7

**test** 77:22,25 78:3,7,9

**testified** 4:13 53:12 61:17 71:21

**testify** 5:3

**testimony** 19:10 56:3 79:20

**Texas** 5:15

**thick** 32:8

**thing** 6:20 31:1 40:11 48:11 65:20

**things** 10:14 11:15,16

30:7 45:9 53:18 54:10 59:15 73:7,23 75:17

**third-party** 29:15

**thirsty** 67:1

**thought** 36:2

**thousand** 51:24

**thousands** 74:6

**time** 17:18 35:21 36:12 37:11 56:20 64:14,15 68:13

**times** 51:12,13 80:5,6

**tire** 35:14,15

**tires** 11:3,23,24 12:4 35:8 36:18 58:14,16

**tissue** 45:5 72:24,25 73:1

**tissues** 44:15 45:17 46:19

**today** 7:3 8:1 62:5 73:19

**tolerance** 73:8 75:24

**tolerances** 73:6,10,23, 25 74:1,12,21 75:18 76:5

**top** 64:6 68:22

**topics** 6:14

**totaled** 14:3 18:17 66:1

**town** 5:14

**tractor** 66:12

**trailer** 13:4,6 14:20,22, 25 15:2,6,7,20,24,25 16:8 19:11,24 20:8,21, 25 24:25 27:15,16,17, 19,23,24,25 32:19,24 33:7,8 34:3,12,15,16 35:2,7,8,10 36:9,11,16, 17,24 37:20,22,23 38:2, 7,8,10,16,17,19,25 39:1,5 47:2,8,14 48:4, 20,24 49:1 50:8,10 52:18,19 53:17,25 55:9 56:25 57:3,6,9,10,16, 17,19,20,23 58:4,17,23 59:1,2,4,20 60:2,7,11, 12,13,25 61:1,8,9 62:16,18,24 63:7,14,16 65:8,15,25 66:1,9,10 68:8,9,13,14 76:23,24 77:23 78:1

**trailer's** 55:6

**train** 66:11

**transcript** 28:9,11

**transferred** 33:5 38:9

**transient** 67:25

**translated** 45:6

**transmit** 32:25

**transmitted** 34:18,23 38:1

**trauma** 74:10

**traumatic** 76:12

**treated** 46:23 70:20

**treatise** 28:14

**treatment** 46:22 72:21

**truck** 32:21 34:5 36:20, 22 39:4,7 41:12 43:5 51:18,22 52:3,4 53:11, 16 54:22 55:2 57:21,23 58:3 61:9 62:17,25 63:9,13 65:8,10,25 77:3,5 78:5

**true** 19:11

**truth** 41:10 58:11

**Tulane** 5:18,22,24

**turn** 23:23 24:13 25:1 34:14 54:23 55:5

**turning** 23:21 42:11 68:8

**twisting** 68:17,19

**type** 9:22 32:24 34:4 47:6 48:12,13 66:22 68:18 70:16 73:12

**types** 11:23,24 46:13,16, 18 74:7


**U**

**uh-huh** 34:17 43:22 80:17

**ultimate** 46:20 54:19

**ultimately** 19:18

**un-meaningful** 15:10

**undeployment** 19:21

**undercarriage** 14:2 49:4

**undergo** 18:10 37:19 39:22

**underneath** 53:11

**understand** 10:23 29:9 30:9,22 57:11 60:14

**understanding** 9:18 24:22

**Understood** 31:21 32:12

**underwent** 46:17

**University** 5:19

**upload** 59:20

**usual** 8:20

**utility** 35:8


**V**

**variances** 65:4,6

**vectors** 55:12

**veer** 25:3,4

**vehicle** 9:25 10:4,14,19, 23 12:1,9 14:3 16:21,23 18:7,17,21 20:3,15,17 22:10 24:6,15,18,19,25

27:21 34:11,22 36:8
37:14,17,22 38:6,14,19
39:11 42:11 44:3 48:16
49:15,16,17 50:2,12
51:7,10 52:7 53:2 54:13
55:5,8,24 56:8,13,23
59:6,23,24 60:15 61:8
65:12,18,24 66:6,7,14,
19 67:14,24 68:2 71:15
72:1 76:1,9 77:9 78:18,
20
**vehicle's** 9:25
**vehicle-to-vehicle** 56:21
**vehicles** 9:17 10:3,20
13:1,5 18:9 19:19 23:5
24:12 37:19 53:21 58:6,
9 59:19 60:21 77:17
78:15,23
**velocity** 42:17,18
**versus** 11:22,24 12:6
62:16 64:9,10 72:8
**vibration** 37:2 66:18
**Victor** 5:9
**viewed** 57:4
**vintage** 18:5
**voice** 49:11

**W**

**waive** 79:11
**walk** 75:22 76:13,14
**walking** 76:14
**watching** 73:16
**water** 67:2,4,6
**ways** 11:12 45:12
**weaker** 75:9
**week** 70:4,5
**weigh** 14:21
**weighed** 15:4,22 16:4,6,
9 60:25 61:1
**weighing** 14:24 15:2
**weighs** 20:15 59:23,24
60:1,2,4 61:2
**weight** 10:5,6,18,24
11:18 15:6,7,17,20,25
20:2,3,9 45:13 62:16
76:23
**weights** 20:7 60:13
**west** 54:22 57:6
**wet** 12:6,9
**Whatever's** 32:2
**whatnot** 28:15
**wood** 69:15
**word** 59:9
**work** 11:10 25:15 29:16
50:13 69:17
**worked** 80:3,5

**wreck** 76:1
**written** 62:4
**wrong** 24:1

**Y**

**yaw** 10:25 36:15,17,19
55:25 57:10,23 68:13,
14
**yawed** 57:4
**yawing** 34:24
**years** 18:18 79:23 80:2

**Z**

**zip** 6:16